Slip Op. 19- 73

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEXTEEL CO., LTD., | |
|       Plaintiff, | |
| and | |
| SEAH STEEL CORPORATION, | |
|       Consolidated Plaintiff, | |
| v. | Before: Jennifer Choe-Groves, Judge |
| UNITED STATES, | Consol. Court No. 18-00083 |
|       Defendant, | <u>PUBLIC VERSION</u> |
| and | |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, and TENARISBAYCITY, | |
|       Defendant-Intervenors. | |

### OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2015–2016 administrative review of the antidumping duty order of oil country tubular goods from the Republic of Korea.]

Dated: June 17, 2019

J. David Park and Henry D. Almond, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., argued for Plaintiff NEXTEEL Co., Ltd.  With him on the brief were Daniel R. Wilson, Leslie C. Bailey, and Kang W. Lee.

Jeffrey M. Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., argued for Consolidated Plaintiff SeAH Steel Corporation.  With him on the brief was Amrietha Nellan.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel was Mykhaylo Gryzlov, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Thomas M. Beline, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Defendant-Intervenor United States Steel Corporation.  With him on the brief were Myles S. Getlan, Sarah E. Shulman, and James E. Ransdell.

Frank J. Schweitzer and Kristina Zissis, White & Case, LLP, of Washington, D.C., argued for Defendant-Intervenors Maverick Tube Corporation and TenarisBayCity.  With them on the brief was Gregory J. Spak.


        Choe-Groves, Judge:  This case involves the second application of the statute permitting

the U.S. Department of Commerce ("Department" or "Commerce") to find the existence of a

particular market situation under the Trade Preferences Extension Act of 2015 ("TPEA").

Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") and Consolidated Plaintiff SeAH Steel Corporation

("SeAH") bring this consolidated action contesting Commerce's final results in the 2015–2016

administrative review of the antidumping duty order on oil country tubular goods from the

Republic of Korea ("Korea").  See Certain Oil Country Tubular Goods From the Republic of

Korea, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping

administrative review and final determination of no shipments; 2015–2016) ("Final Results");

see also Issues and Decision Memorandum for the Final Results of the 2015–2016

Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods

from the Republic of Korea, PD 368, bar code 3694005-01 (April 11, 2018) ("Final IDM").

Before the court are two Rule 56.2 motions for judgment on the agency record filed by

NEXTEEL and SeAH.  For the reasons discussed below, the court sustains in part and remands in part Commerce's <u>Final Results</u>.

**ISSUES PRESENTED**

The court reviews the following issues:

1. Whether Commerce's application of total facts available with an adverse inference ("total adverse facts available" or "total AFA") to NEXTEEL is unsupported by substantial evidence and contrary to the law;

2. Whether Commerce's particular market situation analysis is unsupported by substantial evidence and contrary to the law;

3. Whether Commerce's calculation of SeAH's constructed value profit rate is supported by substantial evidence and contrary to the law;

4. Whether Commerce's decision to reject portions of NEXTEEL's rebuttal brief from the administrative record is contrary to the law;

5.  Whether Commerce's classification of proprietary SeAH products is supported by substantial evidence;

6. Whether Commerce's decision to cap the adjustment for freight revenue on SeAH's U.S. sales is in accordance with the law;

7. Whether Commerce's deduction of general and administrative expenses as U.S. selling expenses is supported by substantial evidence;

8. Whether Commerce's use of the differential pricing analysis is supported by substantial evidence and in accordance with the law.

## BACKGROUND

Commerce initiated an administrative review of the antidumping duty order of oil country tubular goods from Korea on November 9, 2016, based on timely requests from multiple companies.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 78,778 (Nov. 9, 2016) (initiation notice).  The period of review was September 1, 2015, through August 31, 2016.  See id. at 78,781.  Commerce selected NEXTEEL and SeAH as mandatory respondents for individual examination because they were the two exporters or producers accounting for the largest volume of subject merchandise during the period of review. See Mem. Selection of Respondents for the 2015–2016 Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from the Republic of Korea, PD 28, bar code 3535941-01 (Jan. 12, 2017).

Commerce found the existence of a single particular market situation in the previous administrative review.[1]  See Certain Oil Country Tubular Goods from the Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty administrative review; 2014–2015).  Maverick alleged the continued existence of the particular market situation during the instant period of review.  See Maverick Letter Re: Other Factual Information Submission for Valuing the Particular Market Situation in Korea, PD 95, bar code 3569192-01 (May 4, 2017).  Maverick contended that the following conditions existed to create a single particular market situation: (1) subsidies were provided by the Government of Korea to

---

[1] The court held that Commerce's finding of a particular market situation in the previous administrative review was unsupported by substantial evidence on the record.  NEXTEEL Co., Ltd. v. United States, 43 CIT __, __, 355 F. Supp. 3d 1336, 1351 ("NEXTEEL I").

producers of hot-rolled coil; (2) the flood of Chinese hot-rolled flat products caused resulting

pressure on Korean domestic hot-rolled coil prices; (3) strategic alliances existed between

Korean hot-rolled coil suppliers and Korean oil country tubular good producers; and (4) the

Government of Korea influenced the cost of electricity.  See id.  Commerce accepted comments

and supporting documentation from all interested parties on this matter.  See Decision

Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review at

14, PD 298, bar code 3625402-01 (Oct. 2, 2017) ("Prelim. IDM").

      Commerce issued its preliminary results on October 10, 2017.  See Certain Oil Country

Tubular Goods from the Republic of Korea, 82 Fed. Reg. 46,963 (Dep't Commerce Oct. 10,

2017) (preliminary results of antidumping duty administrative review; 2015–2016) ("Preliminary

Results").  Commerce preliminarily assigned a weighted-average dumping margin of 46.37% to

NEXTEEL, 6.66% to SeAH, and 19.68% to all non-examined companies.  See Preliminary

Results, 82 Fed. Reg. at 46,964.

      Commerce issued its final results on April 18, 2018.  See Certain Oil Country Tubular

Goods from the Republic of Korea, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final

results of the antidumping duty administrative review; 2015–2016) ("Final Results"); see also

Issues and Decision Memorandum for the Final Results of the 2015–2016 Administrative

Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the

Republic of Korea, PD 368, bar code 3694005-01 (Apr. 12, 2018) ("Final IDM").  The

Department discovered that NEXTEEL's financial statements contained a mistranslation after

briefing concluded and was not able to inquire further about this mistranslation through the

issuance of supplemental questionnaires.  See Final IDM at 44.  Commerce found "that the

nature of the loans recorded in the line item in question call into question the accuracy of

information submitted by NEXTEEL during the instant review." Id.  As a result, Commerce

determined that NEXTEEL withheld information and "significantly impeded the proceeding,"

and applied total AFA to NEXTEEL.  See id. at 44–49.  Commerce assigned a weighted-average

dumping margin of 75.81% to NEXTEEL and 6.75% to SeAH.  Final Results, 83 Fed. Reg. at

17,147.  Commerce assigned a weighted-average dumping margin of 6.75% to all non-examined

companies based on SeAH's rate because it was the only calculated rate that was not zero, *de

minimis*, or determined entirely on the basis of facts available, consistent with the agency's

practice.  Id.

        NEXTEEL and SeAH initiated separate proceedings in this Court, which the court

consolidated.  See Order, July 31, 2018, ECF No. 29.  NEXTEEL and SeAH both filed Rule 56.2

motions for judgment on the agency record.  See Rule 56.2 Mot. J. Agency R. Pl. NEXTEEL

Co., Ltd., Oct. 8, 2018, ECF No. 36; Mem. Supp. Pl. NEXTEEL Co., Ltd.'s Rule 56.2 Mot. J.

Agency R., Oct. 8, 2018, ECF No. 36-1 ("NEXTEEL's Br."); Mot. Pl. SeAH Steel Corporation

J. Agency R., Oct. 5, 2019, ECF No. 33; Br. SeAH Steel Corporation Supp. Rule 56.2 Mot. J.

Agency R., Oct. 5, 2019, ECF No. 35 ("SeAH's Br.").  The court held oral argument on April 9,

2019.  See Closed Oral Argument, Apr. 9, 2019, ECF No. 64.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[2] and 28

U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final

results of an administrative review of an antidumping duty order.  The court will uphold

Commerce's determinations, findings, or conclusions unless they are unsupported by substantial

evidence on the record, or otherwise not in accordance with the law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence "means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  A.L. Patterson, Inc. v. United States, 585

Fed. Appx. 778, 781–82 (Fed. Cir. 2014) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305

U.S. 197, 229 (1938)).

## ANALYSIS

### I.      Application of Total AFA to NEXTEEL

Section 776 of the Tariff Act provides that if "necessary information is not available on

the record" or if a respondent "fails to provide such information by the deadlines for submission

of the information or in the form and manner requested," then the agency shall "use the facts

otherwise available in reaching" its determination.  19 U.S.C. §§ 1677e(a)(1), (a)(2)(B).  If the

Department finds further that "an interested party has failed to cooperate by not acting to the best

of its ability to comply with a request for information" from the agency, then the Department

---

[2] All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of
Title 19 of the U.S. Code.  All further citations to the U.S. Code are to the 2012 edition, with
exceptions.  All further citations to 19 U.S.C. § 1677b(e) are to the 2015 version, as amended
pursuant to The Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, 129 Stat. 362
(2015).  All citations to the Code of Federal Regulations are to the 2017 edition.

"may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1)(A).  The U.S. Court of Appeals for the Federal Circuit has interpreted these two subsections to have different purposes.  See Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227, 1232 (Fed. Cir. 2014). Subsection (a) applies "whether or not any party has failed to cooperate fully with the agency in its inquiry."  Id. (citing Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011)).  On the other hand, subsection (b) applies only when the Department makes a separate determination that the respondent failed to cooperate "by not acting to the best of its ability."  Id. (quoting Nippon Steel v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

When determining whether a respondent has complied to the "best of its ability," Commerce "assess[es] whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel, 337 F.3d at 1382.  This finding requires both an objective and subjective showing.  Id. Commerce must determine objectively "that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  Id. (citing Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002)).  Next, Commerce must demonstrate subjectively that the respondent's "failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." Id. at 1382–83.  Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when the Department reasonably expected that "more forthcoming responses

should have been made." Id. at 1383. "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." Id.

Commerce may rely on information derived from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record when making an adverse inference. See 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

NEXTEEL contends that Commerce's application of total AFA to NEXTEEL based on one translation issue was contrary to law and unsupported by substantial evidence.[3] NEXTEEL's Br. 20–34. Defendant argues that Commerce properly found that necessary information was not on the record and that NEXTEEL withheld information and significantly

---

[3] [[



]]

impeded the proceeding.  Def.'s Resp. Opp'n Mots. J. Administrative R. 25–30, Dec. 21, 2018,

ECF No. 53 ("Def.'s Br.").  The court disagrees.  The information missing on the record was a

proper translation of a single line item related to loans.  See Final IDM at 43.  The English

translation of the line item at issue simply omitted a modifying phrase from the term.  See id. at

46.  The fact that the line item was related to loans is evident in both the mistranslation and the

corrected translation provided by NEXTEEL.  In order to apply facts available with an adverse

inference, Commerce found that NEXTEEL "did not act to the best of its ability to comply with

Commerce's requests for information because NEXTEEL failed to properly disclose information

related to loans recorded in its 2016 financial statements," i.e., "the English-language version of

NEXTEEL's 2016 financial statements contain a mistranslated line item."  Final IDM at 48.

Because Commerce found that NEXTEEL did not act to the best of its ability, it applied AFA.

Id.  The court concludes that the showing that NEXTEEL did not act to the best of its ability and

willfully withheld information is weak.  NEXTEEL clarified the mistranslation and provided

certified statements from both an independent auditor who originally translated the term and a

third-party translator.  See NEXTEEL's Response to Additional Duty Absorption Comments at

4, PD 344, bar code 3668932-01 (Feb. 2, 2018).  The original translator stated that he translated

the term with a "focus[] on the key financial word" and believed his translation was "a

reasonable and accurate translation of the term."  Id. at Ex. 1.  He further acknowledged that he

"inadvertently" left out the modifying phrase.  Id.  The court concludes that Commerce's use of

total AFA was unreasonable and remands the issue for further consideration consistent with this

opinion.

## II.     Particular Market Situation

Under the Tariff Act of 1930, as amended, Commerce conducts antidumping duty investigations and determines whether goods are being sold at less-than-fair value.  See 19 U.S.C. § 1673.  If the Department finds that subject merchandise is being sold at less-than-fair value, and if the U.S. International Trade Commission finds that these less-than-fair value imports materially injure a domestic industry, the Department issues an antidumping duty order imposing antidumping duties equivalent to "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  Id.  Generally, export price is defined as the price at which the subject merchandise is first sold in the United States, whereas the normal value represents the price at which the subject merchandise is sold in the exporting country.  See id. §§ 1677a(a), 1677b(a)(1)(B)(i).  If Commerce cannot determine the normal value of the subject merchandise based on price, then the statute authorizes Commerce to calculate a constructed value.  Id. § 1677b(a)(4).  The constructed value shall be an amount equal to the sum of, for instance, "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade."  Id. § 1677b(e)(1).

Section 504 of the TPEA amended the Tariff Act to allow Commerce to consider certain sales and transactions to be outside of the ordinary course of trade when "the particular market situation prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677(15).  When calculating constructed value under the revised version of the statute, if Commerce finds the existence of a particular market situation "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production

in the ordinary course of trade, the administering authority may use another calculation

methodology under this subtitle or any other calculation methodology."  19 U.S.C. § 1677b(e).

The legislative history of the TPEA reflects a desire to give Commerce the ability to

choose the appropriate methodology when a particular market situation exists.  One Senate

Report stated that modifications to the Tariff Act under the TPEA "provide that where a

particular market situation exists that distorts pricing or cost in a foreign producer's home

market, the Department of Commerce has *flexibility* in calculating a duty that is not based on

distorted pricing or costs."  S. Rep. No. 114-45, at 37 (2015) (emphasis added).  In a hearing

before the House of Representatives, Senator Patrick Meehan noted that under the TPEA,

Commerce would be "empowered . . . to disregard prices or costs of inputs that foreign

producers purchase if the Department of Commerce has reason to believe or suspects that the

inputs in question have been subsidized or dumped" in the interest of creating an accurate record

and protecting domestic workers.  166 Cong. Rec. H4690 (daily ed. June 25, 2015) (statement of

Sen. Meehan).

Commerce has the ability to choose the appropriate methodology so long as it comports

with its statutory mandate and provides a reasoned explanation.  See Motor Vehicle Mfrs. Ass'n

of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) ("State Farm"); Fujitsu

Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996).  The statute's language and

legislative history permit Commerce's chosen methodology in this investigation, which was to

consider allegations of a particular market situation based on the cumulative effect and the

totality of the conditions in the foreign market.

In the first administrative review of the antidumping duty order covering oil country

tubular goods from Korea, Maverick alleged the existence of four particular market situations

based on: (1) subsidies provided by the Government of Korea to producers of hot-rolled coil; (2)

the flood of Chinese hot-rolled flat products and the resulting pressure on Korean domestic hot-

rolled coil prices; (3) strategic alliances between Korean hot-rolled coil suppliers and Korean oil

country tubular good producers; and (4) the Government of Korea's influence on the cost of

electricity.  See NEXTEEL I, 355 F. Supp. 3d at 1345–46.  Commerce found preliminarily that

no particular market situation existed after evaluating all of the evidence on the record.  See id. at

__, 355 F. Supp. 3d at 1346. Commerce did not receive any new factual information between the

issuance of its preliminary results and its final results.  See id. at __, 355 F. Supp. 3d at 1349–50.

Commerce reversed its conclusion and determined in its final results that the same record

supported finding the existence of a single particular market situation.  See id.  Multiple parties,

including some of the parties in this action, challenged Commerce's determination in this Court.

Upon review of the governing statute and the administrative record, the court held that

Commerce's finding of a single particular market situation based on the totality of circumstances

was reasonable in theory, but that its finding was unsupported by substantial evidence in the first

administrative review.  See id. at __, 355 F. Supp. 3d at 1349–51.

In the instant matter, Commerce relied on its prior finding of the existence of a particular

market situation in the first administrative review and continued to find in this administrative

review that the circumstances remain "largely unchanged."  Final IDM at 17; see also Prelim.

IDM at 17 (stating the same).  Maverick made the same four allegations and submitted the same

supporting exhibits in this proceeding.  See Final IDM at 17–18 (citing documents provided by

Maverick in the first administrative review).  Commerce itself stated, "[W]e agree with Maverick that facts in the instant review are largely identical to the facts in the first administrative review, and the same evidence is on the record of the instant review."  Id. at 18.  Because Commerce's original finding of a particular market situation was not supported by substantial evidence, it is difficult for this court to find, based on substantially the same facts and record evidence, that Commerce's finding in the subsequent administrative review is supported by substantial evidence.

Defendant-Intervenor United States Steel Corporation contends that this administrative review is distinguishable from the first administrative review because the record here is more robust.  Specifically, United States Steel Corporation argues that the record contained twenty-nine new documents and five updated documents compared to the record in the first administrative review.  Closed Oral Argument at 57:08–57:17, 1:01:46–1:02:05.  United States Steel Corporation failed to raise this argument in its opening brief and the court thus deems the argument waived.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").  Notwithstanding the waiver of its arguments, the court notes that United States Steel Corporation's exhibits consisted mostly of news articles, and Commerce did not rely on them when making its ultimate determination.  Compare id. at 4–5 (exhibits list) with Final IDM at 17.  Commerce's reliance on its previous finding to support its continued finding of a particular market situation in this administrative review is clear on the record.  See Final IDM at 17–18.

The court concludes that Commerce's determination of the existence of a particular

market situation in the <u>Final Results</u> is unsupported by substantial evidence.  The <u>Final Results</u>

are remanded for further proceedings.[4]

## III.     Constructed Value Profit Rate

When Commerce is required to calculate a constructed value for a respondent, the statute

requires Commerce to utilize the respondent's actual selling expenses and profits from the home

market or a third-country market.  19 U.S.C. § 1677b(e)(2)(A).  If that data is unavailable, the

statute provides Commerce with three alternatives:

> (i)     the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling, general,
> and administrative expenses, and for profits, in connection with the
> production and sale, for consumption in the foreign country, of merchandise
> that is in the same general category of products as the subject merchandise,

> (ii)    the weighted average of the actual amounts incurred and realized by
> exporters or producers that are subject to the investigation or review (other
> than the exporter or producer described in clause (i)) for selling, general,
> and administrative expenses, and for profits, in connection with the
> production and sale of a foreign like product, in the ordinary course of trade,
> for consumption in the foreign country, or

> (iii)   the amounts incurred and realized for selling, general, and administrative
> expenses, and for profits, based on any other reasonable method, except that
> the amount allowed for profit may not exceed the amount normally realized
> by exporters or producers (other than the exporter or producer described in
> clause (i)) in connection with the sale, for consumption in the foreign
> country, of merchandise that is in the same general category of products as
> the subject merchandise.

---

[4] At oral argument, SeAH contended that the plain language of the statute, 19 U.S.C. § 1677b(e),
requires Commerce to make a specific finding that the respondent's cost of production does not
accurately reflect the cost of production in the ordinary course of trade before resorting to other
methodologies to calculate normal value.  SeAH noted further that respondents want a company-
specific determination, while Commerce advocates for a market-wide determination, but the
court need not reach these issues here.

Id. § 1677b(e)(2)(B).  Subsection three is termed the "profit cap."  See Atar S.r.L v. United

States, 730 F.3d 1320, 1321 (Fed. Cir. 2013).

     In calculating SeAH's constructed value, Commerce determined that SeAH did not have

a viable home or third-country market during the period of review.  See Final IDM at 53.  When

evaluating the statutory alternatives, Commerce found that subsection (i) was unavailable

because other steel products produced by SeAH were not in the same general category of

products as oil country tubular goods.  See id. at 54.  Subsection (ii) was unavailable because no

sales of oil country tubular goods existed in the home market, Korea.  See id.  Commerce chose

subsection (iii).  See id.  Of the seven sources of information on the record identified by

Commerce, Commerce chose to calculate SeAH's constructed value profit by utilizing profit

data from the previous administrative review associated with SeAH's Canadian market sales,

costs, selling, and general expenses.  See id. at 55.  Commerce did not address the constructed

value profit issue as it pertained to NEXTEEL in the Final Results because it resorted to total

adverse facts available and "because [Commerce was] applying total AFA to NEXTEEL for

these results, [its] determination of which CV profit rate and selling expenses to use applies only

to SeAH."  Final IDM at 53.

     NEXTEEL contends that the use of SeAH's data from the previous administrative review

is inappropriate because (1) the data is not contemporaneous and there are important differences

in the market place between the two periods and (2) SeAH's Canadian market sales are subject to

a Canadian antidumping case with respect to the subject merchandise.  NEXTEEL's Br. 38.

NEXTEEL's first contention is incorrect.  Using subsection (iii) to calculate constructed value,

Commerce is free to use "any reasonable method" to determine plaintiff's constructed value.

See 19 U.S.C § 1677b(e)(2)(B)(iii).  Commerce explained that "[w]hile the financial data from

SeAH are less contemporaneous to the POR than are the other alternative financial data sources,

we continue to find that the specificity of the SeAH financial data outweighs concerns over

contemporaneity" because "it represents profit from [oil country tubular goods] produced by a

Korean producer in Korea" and therefore "eliminates some of the inherent flaws that occur using

surrogate financial statements (*e.g.*, profits reflecting products that are not in the same general

category of products as [oil country tubular goods])."  Final IDM at 55–56.  Commerce

concluded that there were no important differences in the market between 2015 and 2016

because "producers faced a decline in oil and gas prices throughout 2015 and 2016; the first eight

months of 2015 overlapped with the first review" and two producers had improved financial

performance.  Id. at 60.  The court concludes that Commerce's use of SeAH's prior review data

is supported by substantial evidence.

NEXTEEL contends further that Commerce's use of SeAH's data is inappropriate

because of an existing antidumping duty case in Canada regarding oil country tubular goods

from Korea.  See NEXTEEL Br. 38.  Although there is a preference for not using "dumped third

country prices to calculate" normal value, there was no evidence of a formal finding of dumping

in the Canadian investigation.  See Alloy Piping Prods., Inc. v. United States, 26 CIT 330, 340–

41, 201 F. Supp. 2d 1267, 1277 (2002) (sustaining Commerce's decision to rely on data derived

from allegedly dumped merchandise in third-country sales).  Commerce "subjected SeAH's

Canadian market sales to a cost test, and only those sales that were made above the cost of

production (i.e., made in the ordinary course of trade) were used in constructing the aggregate

[constructed value] profit and selling expenses."  Final IDM at 59.  Commerce attempted to

make adjustments for possible distortions and to utilize the best available information on the

record to calculate NEXTEEL's constructed value profit.  The court finds that Commerce's use

of SeAH's Canadian market sales was reasonable.

      SeAH contends that Commerce's calculation of constructed value profit is not consistent

with the statute because Commerce did not apply a "profit cap" based on the financial statements

of global oil country tubular goods producers.  SeAH's Br. 6.  Specifically, SeAH argues that

Commerce's "use of the same figures to determine both the profit rate and the 'profit cap' means

that no 'profit cap' was actually applied," and that Commerce erred in not applying a profit cap

based upon the profit earned on all home-market sales of merchandise in the same general

category of merchandise.  Id. at 29–30.  Defendant contends that "the statute does not dictate

which data Commerce is to use when applying 'facts otherwise available,' . . . much less which

data to use when choosing a facts available profit cap."  Def.'s Br. 44.  In the Final Results,

Commerce was "unable to calculate a profit cap based on the actual amounts reported in

accordance with the statutory intent under section 773(e)(2)(B)(iii) of the Act" because "[t]here

is no profit information for sales in Korea of [oil country tubular goods] and products in the same

general category on the record."  Final IDM at 60.  The statute requires only that Commerce

calculate a profit cap but does not dictate which data it must use to do so.  See 19 U.S.C

§ 1677b(e)(2)(B)(iii).  Because Commerce calculated a profit cap, its use of SeAH's data from

the previous administrative review is not contrary to law.

### IV.    Rejection of Portions of NEXTEEL's Rebuttal Brief

      Antidumping duty determinations are subject to strict statutory guidelines.  See 19 U.S.C.

§ 1675(a)(3).  Commerce's regulations specify deadlines for submitting factual information.  See

19 C.F.R. § 351.301(c).  Commerce must cease collecting information before making a final

determination, and Commerce must provide the parties with a final opportunity to comment on

the information obtained by Commerce upon which the parties have not previously had an

opportunity to comment.  19 U.S.C. § 1677m(g).  Commerce must disregard comments

containing new factual information.  Id.  Commerce's interpretation of what constitutes factual

information is upheld unless an "alternative reading is compelled by the regulation's plain

language or by other indications of . . . intent at the time of the regulation's promulgation."  Tri

Union Frozen Prods., Inc. v. United States, 40 CIT __,__, 163 F. Supp. 3d 1255, 1287 (2016)

(quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

        Commerce rejected NEXTEEL's rebuttal brief because it discussed "a proposed

reallocation of G&A expenses, and incorporate[d] new factual information not previously on the

record of this review."  Letter from the Department to NEXTEEL Re: Rejection of NEXTEEL's

Rebuttal Brief, PD 360, bar code 3689435-01 (Mar. 30, 2018); see also Final IDM at 3.

NEXTEEL's information was untimely for purposes of submitting factual information because it

made its submission after the deadline for such information, October 2, 2017.  Letter from the

Department to NEXTEEL Re: Rejection of NEXTEEL's Rebuttal Brief, PD 360, bar code

3689435-01 (Mar. 30, 2018).  NEXTEEL was permitted to refile its rebuttal brief omitting the

information at issue.  Final IDM at 3.  NEXTEEL contends that its proposed calculation was not

new factual information because it was a calculation based on record information.  See

NEXTEEL's Br. 43.  This Court has previously upheld Commerce's decision to reject from the

record a margin calculation based on record data.  See Tri Union Frozen Prods., Inc., 40 CIT at

__, 163 F. Supp. 3d at 1288.  NEXTEEL contends that Tri Union Frozen Products is

distinguishable from the instant case because the calculation at issue here "is a simple function of

basic arithmetic" rather than data created by running record data thorough a "complicated

program." See NEXTEEL's Br. 44, NEXTEEL's Reply Br. Supp. Rule 56.2 Mot. J. Agency R.

21, Feb. 25, 2019, ECF No. 58.  The court disagrees.  A calculation of general and administrative

expenses would similarly constitute data under 19 C.F.R. § 351.102(b)(21)(ii) ("Evidence,

including statements of fact, documents, and data submitted either in support of allegations, or,

to rebut, clarify, or correct such evidence submitted by any other interested party.").

Commerce's rejection of certain portions of NEXTEEL's rebuttal brief is in accordance with the

law.

## V.     Classification of Proprietary SeAH Products

Commerce's January 13, 2017, questionnaire asked SeAH to report a separate reporting

code for proprietary grades of oil country tubular goods that are not listed in the API

Specification 5CT.  See SeAH Initial Questionnaire at B-11, PD 32, bar code 3536487-01 (Jan.

13, 2017).  SeAH informed Commerce that it sold proprietary grades of oil country tubular

goods in the United States and that its product "has the same tensile strength required by the N-

80 specification but it is not heat treated (by normalization or by quenching-and-tempering) in

the manner required by the N-80 norms."  SeAH's March 6, 2017, Section C Questionnaire

Response at 13 n.10, PD 77, bar code 3548887-02, (Mar. 6, 2017).  In the Preliminary Results

and in the Final Results, Commerce combined SeAH's reported code 075 with code 080, which

represented products meeting Commerce's N-80 specification.  See Final IDM 84–85.

Commerce found that because SeAH's proprietary oil country tubular goods shared the same

mechanical properties as goods coded under 080 (i.e., tensile and hardness requirements), the

two goods should be grouped together.  See id. at 84.  "[A]ny differences between these grades were already captured in other product characteristics."  Id.

SeAH argues that Commerce's grouping of its proprietary oil country tubular goods into code 080 was improper because its proprietary product does not meet the heat treatment specification required for N-80 goods.  See SeAH's Br. 7–11; see also Case Brief of SeAH Steel Corporation at 8 n.21, PD 319, bar code 3646189-01 (Nov. 30, 2017) (API 5CT specification for heat treatment, stating that for grade N-80 goods "Full body/ full-length heat treatment is mandatory.  At the manufacturer's option either normalised or normalised and tempered.").  The Government contends that "heat treatment is not a 'physical characteristic' of a product but rather a 'production process' feature."  Def.'s Br. 47.  The Government urges the court to sustain Commerce's finding as reasonable because while SeAH's proprietary oil country tubular goods differ from grade N-80 goods with respect to heat treatment, "they are the same with regard to critical performance properties."  Id. at 48.

Despite the Government's arguments, Commerce failed to distinguish meaningfully between a product's physical characteristics and production process in the Final Results.  The API 5CT specification implies that heat treatment influences a product's specifications and classification under the N-80 grade.  Commerce did not address evidence on the record adequately in making its determination.  The court concludes that Commerce's decision to classify SeAH's proprietary oil country tubular goods as code 080 is unsupported by substantial evidence on the record and remands the issue for further consideration consistent with this opinion.

## VI.    Cap on Adjustment for Freight Revenue on SeAH's U.S. Sales

When calculating SeAH's constructed export price, Commerce offset freight charges and applied a cap on freight revenue for invoices where freight was separately billed.  See Final IDM at 86.  SeAH contends that Commerce's decision to do so is contrary to law because Commerce does not have the authority to deduct freight costs that are not included in the merchandise cost.  See SeAH's Br. 3.  SeAH contests also Commerce's decision to apply a cap for freight revenues but not for losses in export price.  See id. at 4.

Under 19 U.S.C. § 1677a(c), "[t]he price used to establish export price and constructed export price shall be . . . reduced by . . . the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  See 19 U.S.C. § 1677a(c)(2)(A).  Export price or constructed export price is the price at which the subject merchandise is first sold in the United States, as opposed to the sale price in the exporter's home country.  See 19 U.S.C. §§ 1677a(a), 1677b(a)(1)(B)(i).

Commerce uses adjustments when calculating export price or constructed export price "to achieve 'a fair, "apples-to-apples" comparison' between U.S. price and foreign market value."  Fla. Citrus Mut. v. United States, 550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  Such adjustments prevent exporters from improperly inflating the export price of a good by charging a customer for freight more than the exporter's actual freight expenses.  See Dongguan Sunrise Furniture Co. v. United States, 36 CIT __, __, 865 F. Supp. 2d 1216, 1248–49 (2012).  Commerce reasonably adjusts its price

calculation using net freight revenue.  See id. at __, 865 F. Supp. 2d at 1248.  It is reasonable for Commerce not to consider freight revenue as part of the price of the subject merchandise in accordance with the statutory language.  See id. at __, 865 F. Supp. 2d at 1248–49.

SeAH contends that Commerce's treatment of freight revenue below the cap as part of the U.S. price in its calculations, and freight revenue above the cap as not part of the U.S. price in its calculations, is inconsistent with the statute.  See SeAH's Br. 13.  SeAH argues that under the language of section 1677a(c)(2)(A), when Commerce deducted the actual freight costs for sales with separately-invoiced freight charges it must have found that those costs were "included in" the "price used to establish export price and constructed export price," otherwise Commerce would not have been permitted to adjust them.  See SeAH's Br. 12–13.  This is an incorrect reading of the statute.  Section 1677a requires Commerce to make adjustments when calculating export price or constructed export price "to achieve a fair, 'apples-to-apples' comparison between U.S. price and foreign market value."  Fla. Citrus Mut., 550 F.3d at 1110.  A proper comparison between the U.S. price and foreign market value would not include a profit earned from freight rather than from the sale of the subject merchandise.  The court concludes that Commerce's treatment of freight revenue is in accordance with the law.

## VII.    Deduction of General and Administrative Expenses as U.S. Selling Expenses

Commerce allocated the general and administrative ("G&A") expenses related to resold United States products for SeAH's U.S. affiliate Pusan Pipe America Inc. ("PPA").  See Final IDM at 89.  SeAH contends that PPA's administrative activities are related to the overall activities of the company and thus are not all selling expenses that can be deducted.  See SeAH's Br. 14–15.

When calculating a constructed value, Commerce must include selling, general, and administrative expenses.  See 19 U.S.C. §§ 1677b(e)(B)(i)–(iii).  G&A expenses are generally understood to mean expenses that relate to the activities of the company as a whole rather than to the production process.  Torrington Co. v. United States, 25 CIT 395, 431, 146 F. Supp. 2d 845, 885 (2001).  The court affords Commerce deference in developing a methodology for including G&A expenses in the constructed value calculation because it is a determination involving complex economic and accounting decisions of a technical nature.  See Fujitsu Gen. Ltd., 88 F.3d at 1039; see also Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, __, 273 F. Supp. 3d 1161, 1166 (2017).  Commerce still must explain cogently why it has exercised its discretion in a given manner.  See State Farm, 463 U.S. at 48–49.

Commerce explained that because "PPA's G&A activities support the general activities of the company as a whole, including: (1) the sale and further manufacture of further manufactured products; and (2) the sale of non-further manufactured products," it applied the "G&A ratio to the total cost of further manufacture for these products.  In addition, [it] applied PPA's G&A ration to the cost of the imported pipe, regardless of whether the pipe was further manufactured in the United States."  Final IDM at 90.  Commerce also "attributed a portion of PPA's G&A activities, which includes selling functions, to the resold products."  Id.  This explanation does not clarify why Commerce deducted PPA's G&A expenses for resold products, nor does it clarify why it deducted G&A expenses from the cost of the imported pipe.  The court concludes that Commerce's decision to deduct G&A expenses in the Final Results is unsupported by substantial evidence on the record and remands on this issue for clarification or reconsideration of Commerce's methodology.

### VIII.   Differential Pricing Analysis

Commerce ordinarily uses an average-to-average comparison ("A-to-A") of normal values to export prices for comparable merchandise in an investigation when calculating a dumping margin.  <u>See</u> 19 U.S.C. § 1677f-1(d)(1)(A); 19 C.F.R. § 351.414(c)(1).  Commerce can depart from using the A-to-A methodology and instead compare the weighted average of normal values to the export prices of individual transactions for comparable merchandise ("A-to-T") when (1) Commerce finds a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time and (2) Commerce explains why such differences cannot be taken into account using the A-to-A methodology.  <u>See</u> 19 U.S.C. §§ 1677f-1(d)(1)(B)(i)-(ii).  Commerce has adopted the same basis for applying its A-to-T methodology in administrative reviews.  <u>See</u> <u>JBF RAK LLC</u>, 790 F.3d at 1364 ("Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable.").  Commerce applied differential pricing analysis in this case when applying its A-to-T methodology.  <u>See</u> Final IDM at 65.

Commerce determines whether a pattern of significant price differences exists among purchasers, regions, or periods of time with its two-stage differential pricing analysis.  <u>See</u> Prelim. IDM at 8–9.  First, Commerce applies what it refers to as the "Cohen's d test" that measures the degree of price disparity between two groups of sales.  <u>See</u> <u>id.</u> at 9.  Commerce calculates the number of standard deviations by which the weighted-average net prices of U.S. sales for a particular purchaser, region, or time period (the "test group") differ from the weighted-average net prices of all other U.S. sales of comparable merchandise (the "comparison group").  <u>See</u> <u>id.</u>  The result of this calculation is a coefficient.  <u>See</u> <u>id.</u>  The Cohen's d

coefficient is used to evaluate the extent to which the net prices to a particular purchaser, region, or time period differ significantly from the net prices of all other sales of comparable merchandise.  See id.  A group of sales with a coefficient equal to or greater than 0.8 "passes" the test and signifies to Commerce that a significant pattern of price differences exists within that group of sales.  See id. at 9–10.  Commerce then applies the "ratio test" to measure the extent of significant price differences.  See id. at 10.  If the value of sales that pass the Cohen's d test account for 66 percent or more of the value of total sales, that indicates to Commerce that the pattern of significant price differences warrants application of the A-to-T method to all sales. See id.  If the value of sales that pass the Cohen's d test is more than 33 percent and less than 66 percent of the value of all sales, Commerce takes a hybrid approach, applying the A-to-T method to the sales that passed its Cohen's d test and applying the A-to-A method to all other sales.  See id.  Commerce will apply the A-to-A method to all sales if 33 percent or less of a respondent's total sales pass its Cohen's d test.  See id.  If both the Cohen's d test and ratio test demonstrate that the A-to-T methodology should be considered, Commerce applies its "meaningful difference" test, pursuant to which Commerce evaluates whether the difference between the weighted-average dumping margins calculated by the A-to-A method is meaningfully different than the weighted-average dumping margins calculated by the A-to-T method.  See id.

### A. Commerce's Use of Numerical Thresholds Throughout the Differential Pricing Analysis

The Court of Appeals for the Federal Circuit and this Court have held the steps underlying the differential pricing analysis as applied by Commerce to be reasonable.  See e.g., Apex Frozen Foods Private Ltd. v. United States, 40 CIT __, __, 144 F. Supp. 3d 1308, 1313–35

(2016), aff'd, 862 F.3d 1337 (Fed. Cir. 2017); Apex Frozen Foods Private Ltd. v. United States,

41 CIT __, __, 208 F. Supp. 3d. 1398, 1403–17 (2017); Tri Union Frozen Prods., Inc. v. United

States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1303 (2016).  Commerce's use of the differential

pricing analysis was not subject to the notice and comment requirements of the Administrative

Procedure Act.  See Apex Frozen Foods Private Ltd., 40 CIT at __, 144 F. Supp. 3d at 1321.

       SeAH contends that record evidence does not support Commerce's use of the differential

pricing analysis here.  See SeAH's Br. 6–7.  Specifically, SeAH argues that Commerce must

explain why its differential pricing analysis application and why any of the numerical thresholds

used during the analysis are appropriate in the context of each specific case.  See SeAH's Br. 33.

SeAH cites Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States, 10 CIT 301, 634

F. Supp. 419 (1986) ("Carlisle Tire"), and Washington Red Raspberry Commission v. United

States, 859 F.2d 898 (Fed. Cir. 1988) ("Wash. Red Raspberry Comm'n"), as support for the

proposition that Commerce can only apply mathematical assumptions and numerical thresholds

that have not been adopted in accordance with the Administrative Procedure Act if the record

contains substantial evidence supporting the application.  See SeAH's Br. 34–35.  Both cases

concerned only Commerce's application of the 0.5 percent *de minimis* standard in antidumping

investigations and can be distinguished from the instant case.  See Wash. Red Raspberry

Comm'n, 859 F.2d at 902; Carlisle Tire, 10 CIT at 302, 634 F. Supp. at 421.  The *de minimis*

standard needed to be promulgated in accordance with the notice and comment provisions of the

Administrative Procedure Act.  See Carlisle Tire, 10 CIT at 305, 634 F. Supp. at 423.  That is not

true of Commerce's differential pricing analysis.  See Apex Frozen Foods Private Ltd., 40 CIT at

__, 144 F. Supp. 3d at 1321 ("Commerce's shift from the Nails test to the differential pricing

analysis is not subject to notice and comment requirements.").  Because there is not support for

SeAH's argument that Commerce can only apply mathematical assumptions and numerical

thresholds that have not been adopted in accordance with the Administrative Procedure Act if the

record contains substantial evidence supporting the application, the court need not disturb

Commerce's practice.

### B.  Commerce's Use of the Cohen's d Test

The Court gives Commerce deference in determinations "involv[ing] complex economic

and accounting decisions of a technical nature."  See Fujitsu Gen. Ltd., 88 F.3d at 1039.  When

Commerce applies the Cohen's d test, all of the respondent's sales are analyzed.  See Prelim.

IDM at 9.  Sampling technique, sample size, and statistical significance are not relevant

considerations in the context of analyzing all sales.  See Tri Union Frozen Prods. Inc., 40 CIT at

__, 163 F. Supp. 3d at 1302.

SeAH contends that Commerce's use of the Cohen's d test is contrary to well-recognized

statistical principles.  See SeAH's Br. 36–38.  Specifically, SeAH argues that the Cohen's d test

can only be used when comparing random samples drawn from normal distributions with

roughly equal variance containing a sufficient number of data points.  See id. at 36.  During the

review, Commerce explained that "the U.S. sales data which SeAH has reported to Commerce

constitutes a population.  As such, sample size, sample distribution, and the statistical

significance of the sample are not relevant to the Department's analysis."  Final IDM at 71.

Commerce explained its use of the Cohen's d test in this case and did not need to consider

sample size, sample distribution, and the statistical significance of the sample, and therefore the

court finds that Commerce's approach is supported by substantial evidence on the record.

### C.  The "Ratio Test" Thresholds

The thresholds in the ratio test have previously been upheld by this Court as reasonable and in accordance with the law.  See e.g., U.S. Steel Corp. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1300, 1311 (2017) (Commerce "has reasonably explained why its ratio test is reasonable and not arbitrarily applied.").  If Commerce's rationale for adopting such thresholds is reasonably explained, the standard of review does not require that Commerce explain the statistical calculations and methodologies that allowed it to arrive at such thresholds.  See U.S. Steel Corp. v. United States, 40 CIT __, __ 179 F. Supp. 3d 1114, 1126 (2016) (citing State Farm, 463 U.S. at 48–49).

SeAH contends that Commerce failed to provide any evidence or reasonable explanation to support the 33 and 66 percent thresholds used in the "ratio test" portion of the differential pricing analysis.  See SeAH's Br. 38–40.  Commerce explained that "when a third or less of a respondent's U.S. sales are not at prices that differ significantly, then these significantly different prices are not extensive enough to satisfy the first requirement of the statute," which requires Commerce to find a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or period of time.  See Final IDM at 72.  Commerce explained further that "when two thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that it would not permit the Department to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly."  Id.  When Commerce "finds that between one third and two thirds of U.S. sales are at prices that differ significantly, then there exists a pattern of prices that differ significantly, and that the effect of this pattern can reasonably be separated from the sales

whose prices do not differ significantly." Id.  As in United States Steel Corporation, the court

can discern that Commerce developed its ratio test to identify the existence and extent to which

there is a pattern of export prices for comparable merchandise that differ significantly among

purchasers, regions, or periods of time.  See U.S. Steel Corp., 40 CIT at __, 179 F. Supp. 3d at

1127.  The court finds that Commerce's use of the 33 and 66 percent thresholds in the ratio test is

supported by evidence on the record.

**D. Commerce's Explanation of Why the Alleged Pattern Could Not Be Taken into Account by the A-to-A Comparison**

The Court of Appeals for the Federal Circuit has held that Commerce's use of the

"meaningful difference analysis," through which Commerce evaluates whether the difference

between the weighted-average dumping margins calculated by the A-to-A method is

"meaningfully" different than the weighted-average dumping margins calculated by the A-to-T

method, is reasonable.  See Apex Frozen Foods Private Ltd., 862 F.3d at 1347–48.

SeAH contends that Commerce failed to satisfy its statutory burden of explaining why

the alleged pattern of price differences could not be taken into account by the normal A-to-A

comparison.  See SeAH's Br. 40–43.  Specifically, SeAH argues that Commerce is required to

explain how substantial evidence on the record provides a factual basis for concluding that the

results of the A-to-T calculation are more accurate than the results of the A-to-A calculation in

this specific case.  See id. at 41.  In the Final Results, Commerce explained that the comparison

of the results using the A-to-T method versus the A-to-A method sheds light on whether use of

the A-to-A method can account for SeAH's significant prices differences.  See Final IDM at 73.

Because Commerce's meaningful difference analysis is reasonable, and Commerce explained

that the A-to-A method could not account for the significant price differences in SeAH's pricing

behavior, the court finds that Commerce's use of the A-to-T method is supported by evidence on

the record.

## CONCLUSION

For the foregoing reasons, the court concludes that:

1. Commerce's application of total facts available to NEXTEEL is unsupported by substantial evidence and contrary to the law;

2. Commerce's particular market situation analysis is unsupported by substantial evidence;

3. Commerce's calculation of NEXTEEL's constructed value profit is supported by substantial evidence and in accordance with the law;

4. Commerce's decision to reject portions of NEXTEEL's rebuttal brief from the administrative record is in accordance with the law;

5. Commerce's classification of proprietary SeAH products is unsupported by substantial evidence;

6. Commerce's decision to cap the adjustment for freight revenue on SeAH's U.S. sales is in accordance with the law;

7. Commerce's decision to deduct SeAH's general and administrative expenses as U.S. selling expenses is unsupported by substantial evidence;

8. Commerce's use of its differential pricing analysis is supported by substantial evidence and in accordance with the law.

Accordingly, it is hereby

Consol. Court No. 18-00083                                              Page 32

      **ORDERED** that the Rule 56.2 motions for judgment on the agency record filed by

NEXTEEL and SeAH, are granted in part; and it is further

      **ORDERED** that the <u>Final Results</u> are remanded to Commerce for further proceedings

consistent with this opinion; and it is further

      **ORDERED** that Commerce shall file its remand redetermination on or before August 16,

2019; and it is further

      **ORDERED** that Commerce shall file the administrative record on remand on or before

August 30; and it is further

      **ORDERED** that the Parties shall file comments on the remand redetermination on or

before September 16, 2019; and it is further

      **ORDERED** that the Parties shall file replies to the comments on or before October 16,

2019; and it is further

      **ORDERED** that the joint appendix shall be filed on or before October 30, 2019.


                               /s/ Jennifer Choe-Groves
                                Jennifer Choe-Groves, Judge

Dated: <u>June 17, 2019</u>
       New York, New York