Slip Op. 20-69

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NEXTEEL CO., LTD.,<br><br>      **Plaintiff,**<br><br>**and**<br><br>SEAH STEEL CORPORATION,<br><br>      **Consolidated Plaintiff,**<br><br>**v.**<br><br>UNITED STATES,<br><br>      **Defendant,**<br><br>**and**<br><br>UNITED STATES STEEL<br>CORPORATION, ET AL.,<br><br>      **Defendant-Intervenors.** | Before: Jennifer Choe-Groves, Judge<br><br>Consol. Court No. 18-00083 |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's remand redetermination following the 2015–2016 administrative review of the antidumping duty order on oil country tubular goods from the Republic of Korea.]

Dated: May 18, 2020

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff NEXTEEL Co., Ltd.

Jeffrey M. Winton and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff SeAH Steel Corporation.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia

Burke, Assistant Director.  Of counsel was Mykhaylo Gryzlov, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Thomas M. Beline, Myles S. Getlan, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White & Case LLP, of Washington, D.C., for Defendant-Intervenors Maverick Tube Corporation and Tenaris Bay City, Inc.

Choe-Groves, Judge:  The court revisits the second administrative review of the antidumping duty order on oil country tubular goods ("OCTG") from the Republic of Korea ("Korea") conducted by the Department of Commerce ("Commerce"), covering the period from September 1, 2015 to August 31, 2016.  See Certain Oil Country Tubular Goods From the Republic of Korea, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty administrative review and final determination of no shipments; 2015–2016) ("Final Results"), and accompanying Issues and Decision Memorandum for the Final Results of the 2015–2016 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea, P.R. 368 (Apr. 11, 2018) ("Final IDM").[1]  Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 81-1 ("Remand Redetermination"), which the court ordered in NEXTEEL Co., Ltd. v. United States, 43 CIT ___, 392 F. Supp. 3d 1276 (2019) ("NEXTEEL II").

---

[1] Citations to the administrative record reflect the public administrative record ("P.R.") document numbers.

## I.   BACKGROUND

The court presumes familiarity with the facts and procedural history of this case and recites the facts relevant to the court's review of the Remand Redetermination.  NEXTEEL II, 392 F. Supp. 3d at 1283–84.

In this second administrative review of OCTG from Korea ("OCTG II"), Commerce selected Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") and Consolidated Plaintiff SeAH Steel Corporation ("SeAH") (together, "Plaintiffs") as mandatory respondents for individual examination.  In the Final Results, Commerce concluded that: (1) NEXTEEL failed to cooperate to the best of its ability and thus calculated its dumping margin using total facts available with an adverse inference ("AFA"), id. at 43; (2) an upward adjustment to SeAH's reported costs of producing OCTG was warranted to correct for a particular market situation that existed for hot-rolled coil in Korea, id. at 17; (3) SeAH's proprietary grade OCTG products should be classified as grade code "080," id. at 84; and (4) SeAH's general and administrative expenses related to resold U.S. products for its U.S. affiliate, Pusan Pipe America Inc. ("PPA"), should be deducted as U.S. selling expenses, id. at 89.[2]

Plaintiffs filed separate actions challenging several aspects of the Final Results, which were later consolidated before this Court.  NEXTEEL II, 392 F. Supp. 3d at 1284.  In NEXTEEL II, the court sustained in part and remanded in part the Final Results.  Id. at 1282.  Specifically, the court ordered Commerce to reconsider or further explain: (1) the application of total AFA to NEXTEEL's margin calculation, id. at 1286; (2) the finding of a particular market situation in

---

[2] Commerce did not apply a particular market situation adjustment to NEXTEEL's dumping margin because NEXTEEL's rate was based on total AFA.  Final IDM at 16.

Korea, id. at 1288; (3) the classification of SeAH's proprietary products, id. at 1292; and (4) the

deduction of PPA's G&A expenses as U.S. selling expenses, id. at 1293–94.

On remand, Commerce filed under protest and "calculated NEXTEEL's dumping margin

based on NEXTEEL's reported data rather than [AFA]." Remand Redetermination at 44.[3]  As to

the particular market situation finding, Commerce reviewed the record *de novo*, provided more

explanation, and again found that a particular market situation in Korea distorted the cost of

producing OCTG. See id. at 19–29 (adjusting the mandatory respondents' margins based on a

countervailing duty rate found in an investigation of certain hot-rolled steel flat products from

Korea).[4]  Commerce further explained the basis for classifying SeAH's proprietary grade OCTG

products as grade code "080" (the grade for normalized N-80 pipe) and for deducting PPA's

G&A expenses as U.S. selling expenses.  See id. at 30–42.  Commerce thus recalculated the

weighted-average dumping margins of NEXTEEL, SeAH, and the non-examined companies,

which changed from 6.75% to 5.41%, 75.81% to 46.71%, and 6.75% to 26.06%.  Id. at 76.

---

[3] Commerce preserves its right to appeal when making a finding under protest, which the Court later sustains after remand.  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

[4] Remand Redetermination at 18 & n.84 (citing Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination, 81 Fed. Reg. 53,439 (Aug. 12, 2016), as amended by Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders, 81 Fed. Reg. 67,960 (Oct. 3, 2016); and Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Notice of Court Decision Not in Harmony With Amended Final Determination of the Countervailing Duty Investigation, 84 Fed. Reg. 23,019 (May 21, 2019) (reducing POSCO's total AFA CVD rate from 56.68% to 41.57%) (collectively, "Hot-Rolled Steel Flat Products from Korea")).

Plaintiffs oppose certain aspects of the Remand Redetermination.  Comments of SeAH Steel Corp. on Commerce's Nov. 5, 2019, Remand Redetermination, ECF No. 83 ("SeAH Br."); Pl. NEXTEEL's Comments in Opp'n to Remand Redetermination, ECF No. 85 ("NEXTEEL Br.").  Defendant United States and Defendant-Intervenors Maverick Tube Corp. ("Maverick"), Tenaris Bay City, and United States Steel Corporation ("U.S. Steel") urge the court to sustain the Remand Redetermination.  Responsive Comments of Def.-Intervenors Maverick Tube Corp. and Tenaris Bay City, Inc. in Supp. of Commerce's Remand Redetermination, ECF No. 88 ("Maverick Br."); Def.'s Resp. to Comments Regarding the Remand Redetermination, ECF No. 89 ("Def. Br."); and Def.-Intervenor United States Steel Corp.'s Comments in Supp. of Commerce's Remand Redetermination, ECF No. 90 ("U.S. Steel Br.").  For the following reasons, the court sustains in part and remands in part the Remand Redetermination.

## II.    JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final results of an administrative review of an antidumping duty order.  The court will uphold Commerce's determinations, including redeterminations made on remand, unless the findings are unsupported by substantial record evidence, or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## III.   DISCUSSION

### A. Particular Market Situation Finding

Plaintiffs challenge the particular market situation finding on multiple fronts.  Plaintiffs argue that the court's remand instructions in NEXTEEL II barred Commerce from conducting a

new examination and finding a particular market situation on remand because Commerce neither

reopened the record nor gathered additional facts.  NEXTEEL Br. at 6; see SeAH Br. at 3

(asserting that Commerce cannot use its redetermination "as a vehicle for relitigating the issues

on which the Court ruled against it").  Plaintiffs also contend that Commerce's reliance on the

same record developed during the prior (first) OCTG administrative review ("OCTG I") infects

Commerce's finding of a particular market situation here in OCTG II.  In OCTG I, this Court

found Commerce's particular market situation finding was unsupported by substantial evidence.

Additionally, here, Commerce considered a new fifth factor that was absent from the OCTG I

review: an alleged "steel industry restructuring effort" by the Korean Government.  See

NEXTEEL Br. at 6; SeAH Br. at 2–3.  NEXTEEL further adds that Commerce's consideration

of the fifth factor was procedurally improper because, until this remand proceeding, Commerce

gave respondents no notice or opportunity to rebut the claim that industry restructuring efforts

contributed to a particular market situation.  NEXTEEL Br. at 26–27.  Even if considered,

Plaintiffs contend that the record evidence Commerce identified as showing government-

influenced steel industry restructuring efforts cannot fill the evidentiary void infecting the

particular market situation finding because there is no evidence of actual restructuring and no

evidence of actual government interference.  Id. at 27–28; see SeAH Br. at 6–8.

        In OCTG I, Commerce reviewed Maverick's four allegations as each supporting a

finding of a particular market situation in Korea: (1) subsidization of Korean hot-rolled coil

("HRC") products by the Korean Government; (2) distortive pricing of unfairly-traded Chinese

HRC; (3) "strategic alliances" between Korean HRC suppliers and Korean OCTG producers; and

(4) distortive government control over electricity prices in Korea.  NEXTEEL Co., Ltd. v. United

States, 43 CIT at ___, 355 F. Supp. 3d 1336, 1345–46 (2019) ("NEXTEEL I").  Addressing each

allegation in turn, Commerce made a preliminary determination that no particular market

situation existed based on the record evidence.  Id. at 1346 (citation omitted).  Nevertheless,

without receiving any new record evidence, Commerce reversed itself and found an extant

particular market situation in OCTG I based on the "cumulative effect" of the four allegations.

Id. at 1346, 1349.  Although "Commerce's particular market situation approach was reasonable

in theory[,]" the court held that the finding was unreasonable as unsupported by substantial

evidence because a reasonable mind could not find that "individually the facts would not support

a particular market situation, but when viewed as a whole, these same facts could support the

opposite conclusion."  Id. at 1351.  The court directed Commerce "to reverse the finding of a

particular market situation and recalculate the dumping margin for the mandatory respondents

and non-examined companies."  Id.

      In OCTG II, Commerce again found that a particular market situation in Korea distorted

the cost of producing OCTG.  NEXTEEL II, 392 F. Supp. 3d at 1287–88.  Maverick again made

the same four particular market situation allegations that Commerce reviewed in OCTG I and

submitted the same supporting exhibits.  Id. at 1288.  Commerce used the same "totality of the

circumstances" methodology and found that the circumstances present in the Korean market in

the OCTG II review remained "largely unchanged" since the prior OCTG I review because the

"facts in the [OCTG II] administrative review are largely identical to the facts in the [OCTG I]

administrative review, and the same evidence is on the record of the instant [OCTG II] review."

Id.  Commerce reasoned that the "collective impact" of the same four factors considered in its

particular market situation analysis in OCTG I and the "largely identical" facts here in OCTG II

compelled finding a particular market situation.  Id.  Given that the OCTG I particular market

situation finding was based on substantially the same facts and record evidence, the court

concluded that Commerce's particular market situation finding in OCTG II likewise "[wa]s

unsupported by substantial evidence."  NEXTEEL II, 392 F. Supp. 3d at 1288.[5]

In the Remand Redetermination, Commerce examined the same four factors that

Maverick alleged as creating a particular market situation (subsidization, effects of Chinese HRC

imports, strategic alliances, and government control over electricity prices) but also cited a new

fifth factor as supporting a particular market situation—an allegation of a "steel industry

restructuring effort by the Korean [G]overnment."  Remand Redetermination at 19–20.

Commerce reasoned that the cumulative effects of these five factors supported a conclusion that

a particular market situation distorted the cost of production of OCTG and compelled making an

upward adjustment to the mandatory respondents' reported costs of production for Korean

OCTG.  Id. at 18 (making the particular market situation adjustment based on the CVD rate

found in Hot-Rolled Steel Flat Products From Korea).

The TPEA amended certain subsections of the Tariff Act of 1930.  See Trade Preferences

Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) ("TPEA").  Section 504 of the

TPEA permits Commerce to consider certain sales and transactions to be outside the ordinary

course of trade" when "the particular market situation prevents a proper comparison with the

export price or constructed export price."  19 U.S.C. § 1677(15).  When calculating constructed

---

[5] The court rejected Defendant-Intervenor U.S. Steel's contention that the administrative record
developed in OCTG II was distinguishable from OCTG I because the OCTG II record contained
more evidence when that evidence "consisted mostly of news articles, and Commerce did not
rely on them when making its ultimate decision."  NEXTEEL II, 392 F. Supp. 3d at 1288.

value under the revised statute, if Commerce finds an extant particular market situation, "such

that the cost of materials and fabrication or other processing of any kind does not accurately

reflect the cost of production in the ordinary course of trade, the administering authority may use

another calculation methodology under this subtitle or any other calculation methodology." Id.

§ 1677b(e).

Here, Commerce's reexamination and further explanation of the record evidence

supporting the particular market situation finding continues to be unsupported by substantial

evidence.

As to the first factor, Commerce's analysis on the impact of subsidization remains

unchanged from OCTG I, to OCTG II, to the Remand Redetermination.  Commerce examined

the impact of subsidization in Korea in OCTG I, preliminarily determined that there was no

evidence to support the claim, and, based on the same evidence, reversed its conclusion, which

the court found unreasonable and unsupported by record evidence.  See NEXTEEL I, 355 F.

Supp. 3d at 1350–51.  Commerce's finding of a particular market situation in the Remand

Redetermination relies on its continued argument that, despite the lack of evidence regarding

Korean subsidization, the factors viewed collectively could support a particular market situation.

The court notes that an examination of the impact of Korean subsidization in the Remand

Redetermination still fails to support a finding of a particular market situation.  Commerce's

conclusion that the Government of Korea subsidized HRC production through the primary input

of OCTG based on a subsidy rate found in Hot-Rolled Steel Flat Products from Korea has a

temporal problem.  The almost 60% AFA-based subsidy rate assigned to mandatory respondent

POSCO in Hot-Rolled Steel Flat Products from Korea was in calendar year 2014.  Commerce

performed its first review of the countervailing duty order on HRCs covering calendar year

2016—finding a much lower subsidy rate of 0.54% for POSCO, 0.58% for Hyundai Steel Co.,

Ltd., and 0.56% for all others.[6]  Commerce rejected Plaintiffs' contentions that the HR Korea

CVD I investigation had any overlap with the period of review at issue here in OCTG II

(September 1, 2015 to August 31, 2016).  Remand Redetermination at 60.[7]  Yet the HR Korea

---

[6] See Certain Hot-Rolled Steel Flat Products from Korea: Preliminary Results of Countervailing Duty Administrative Review, 2016, 83 Fed. Reg. 55,517 (Nov. 6, 2018); Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016, 84 Fed. Reg. 28,461 (Dep't Commerce June 19, 2019), as amended by Certain Hot-Rolled Steel Flat Products from Korea: Amended Final Results of the First Administrative Review, 84 Fed. Reg. 35,604 (July 24, 2019) (collectively, "HR Korea CVD I Review").  Commerce determined that the application of AFA to POSCO and Hyundai Steel Co., Ltd. was unwarranted.

[7] Commerce reasoned, in pertinent part, that:

> NEXTEEL's and SeAH's continued assertions that Commerce has found that POSCO was subsidized at much lower rates in the subsequent POR of *Hot-Rolled Steel Flat Products from Korea* are misplaced. *Commerce's determinations regarding the level of POSCO's subsidization in subsequent PORs have no bearing on subsidization during the earlier period of time at issue in this proceeding.* The levels of subsidization and the amount of benefit may change up or down during the different time periods. Commerce has reasonably relied on this information to determine the valuation of NEXTEEL and SeAH's HRC because *it is the timeliest,* most input-specific information available for the POR of the instant review of OCTG and the most appropriate for determining a value of HRC inputs. *If Commerce were to use the most recent rates of subsidization established for HRC, as NEXTEEL and SeAH suggest, the data for subsidization would post-date the POR (i.e., would be derived from the future periods in relation to the POR).* We are not persuaded that such approach is warranted here, where we have relevant information that does not post-date the POR and, thus, does not present the timing problem of using information that did not exist at the time of the POR.

Remand Redetermination at 59–60 (emphasis added).

CVD I Review covered calendar year 2016, overlapping eight of the twelve months of the OCTG

II period of review.  HR Korea CVD I Review and accompanying Issues and Decisions

Memorandum at 5 (explaining that although the period of review ran from August 12, 2016, to

December 31, 2016, Commerce "analyzed data for the period January 1, 2016, through

December 31, 2016, to determine the countervailable subsidy rate[s]").  Thus, Commerce's

statement that the HR Korea CVD I Review rates "have no bearing on subsidization during the

earlier period of time at issue" and that the HR Korea CVD I Review rates are "derived from

future periods in relation to the [period of review]" appears premised on a misunderstanding of

the time periods of review covered by the various proceedings.  Remand Redetermination at 59–

60.  The HR Korea CVD I Review is not some "future period."  Based on the record evidence

and repackaged subsidization analysis, the court again views Commerce's finding that

subsidization contributed to distortions of Plaintiffs' costs to produce OCTG in Korea as

unsupported by substantial evidence.  The court finds that Commerce's conclusion of a particular

market situation based on subsidization in Korea is not supported by substantial evidence.

As to the second factor, impact of Chinese HRC imports, the two documents relied on by

Commerce do not bear out a conclusion that the onslaught of imported "cheap Chinese steel

products" in the Korean steel market "plac[ed] downward pressure on Korean domestic steel

prices."  Remand Redetermination at 21–22 (citing (1) a January 2016 Asian Steel Watch article

titled "China's Steel Exports Reaching 100 Mt: What It Means to Asia and Beyond" ("Asian

Steel Watch article") and (2) a translated document excerpt, dated September 30, 2016, titled

"Announcement for and Excerpts from Relevant Ministries of the Government of Korea,

Proposal for Strengthening the Competitiveness of the Steel Industry" ("Announcement")).[8]

   The Asian Steel Watch article contains a discussion of market conditions in 2014—

several months preceding this OCTG II period of review.  The article references trade volumes

and the amount of steel exported, but there is nothing "particular" in reading that both China and

Korea are major steel producers and consumers with imports and exports.  The Announcement

document refers to global trends in the steel industry, remarks that Chinese imports are

"primarily for construction uses" in the domestic market, and mentions a price "differential"

between domestic and Chinese HRC below a chart noting that Chinese imports accounted for

25% market share.  There is no reference to "downward pressure on Korean domestic steel

prices" as Commerce claims.  Id. at 21.  Commerce also found "it significant that the Korean

[G]overnment's [Announcement] document indicates that Chinese excess supply is 'especially

targeted' towards Korea."  Id. at 22.  Yet the full quote actively subverts that conclusion.  The

Announcement states that "China's excess supply [is] *especially targeted towards Korea,*

*ASEAN, and EU.*"  Maverick's Particular Market Situation submission, Ex. 5, P.R. 217–220

(emphasis added).  It would be unreasonable for Commerce to conclude that this evidence

demonstrates that Chinese excess supply is "especially targeted towards Korea" alone, when

Chinese HRC imports were also aimed at ten countries comprising the Association of Southeast

---

[8] Defendant-Intervenor U.S. Steel submitted the Asian Steel Watch article as evidence
supporting a particular market situation allegation.  Final IDM at 21 n.75 (citing United States
Steel Particular Market Situation Submission, Ex. 2, P.R. 225–27 (Aug. 7, 2017)).  Maverick
submitted the Announcement document as an exhibit accompanying its particular market
situation allegation.  Maverick's Particular Market Situation Submission, Ex. 5, P.R. 217–20
(Aug. 7, 2017).

Asian Nations (ASEAN) and twenty-eight countries comprising the European Union (prior to the

United Kingdom's exit from the European Union).  Besides, Commerce's own determination

undermines its claims of "downward pressure" on prices.  Final IDM at 30 ("[W]e are unable to

quantify the effect of Chinese imports on Korean HRC[.]").  Indeed, it is consistent with what

Commerce found in the <u>Final Results</u>.  <u>See</u> Final IDM at 21 ("We agree with NEXTEEL that the

petitioners have not pointed to any evidence that Chinese overcapacity is directed toward the

Korean market.  That Chinese steel overcapacity affects the whole world is not disputed.").

Given the analytical deficiencies, along with the unsupported finding of significant subsidization,

the court finds that the record evidence does not support a conclusion that the global glut of

Chinese HRC imports caused price distortions specific to the Korean steel market.  Thus,

Commerce's conclusion that excess capacity of Chinese HRC imports demonstrates a particular

market situation in Korea is not supported by substantial evidence.

  As to the third factor, the finding that "strategic alliances" between certain Korean HRC

and Korean OCTG producers affect prices in the Korean steel market, is unsupported by

substantial evidence.  Commerce references the same evidence that the court previously rejected

as not constituting substantial evidence, such as an outdated affidavit provided by Maverick that

"pertained to discussions that occurred before the period of review and did not contain

information about specific agreements." <u>NEXTEEL I</u>, 355 F. Supp. 3d at 1350; <u>see</u> Final IDM at

30 (Because of limited data in the review, Commerce found "that strategic alliances could not be

used to quantify the impact of the particular market situation[.]").  Commerce now puts forth

purely speculative conclusions that strategic alliances "may have created distortions" and "have

the potential to impact HRC pricing." <u>Remand Redetermination</u> at 23; Final IDM at 18

("Although the record does not contain specific evidence showing that strategic alliances directly created a distortion in HRC pricing in the current [OCTG II] period of review, Commerce nonetheless finds that these strategic alliances between Korean HRC suppliers and Korean OCTG producers are relevant . . . in that they *may have* created distortions in the prices of HRC in the past, and *may* continue to impact HRC pricing in a distortive manner during the [OCTG II] [period of review] and in the future."). The court affords no weight to these speculative and conclusory statements as evidence. Commerce considered no new evidence here, and the court's determination that this element of the Final Results was unsupported by substantial evidence applies equally on remand. The court concludes that Commerce's determination that strategic alliances between Korean HRC and OCTG producers affected prices in the Korean steel market to create a particular market situation is not supported by substantial evidence.

As to the fourth factor, Commerce claims that the Korean Government's regulation of the Korean electricity market contributes to a particular market situation, but the record evidence is plagued with factual deficiencies that cannot be cured with more explanation. Again, based on insufficient record evidence, Commerce was "unable to quantify the effect of [distortions in] the electricity market on the particular market situation," that being the cost to produce OCTG. Final IDM at 22, 30. On remand, Commerce noted the Korean Government's "tight control" of pricing in the electricity market, discussed the impact of electricity prices on the OCTG manufacturing process, and made the inferential leap that Korean electricity prices to OCTG producers distort the prices for HRC in Korea. See Remand Redetermination at 23–25. Even recognizing the Korean Government's hands-on approach to regulating the electricity market, Commerce has found in prior CVD investigations, more than once, no evidence that Korean steel

producers received countervailable subsidies as to electricity.[9]  The court concludes that

Commerce's determination that the Korean Government's regulation of the Korean electricity

market contributes to a particular market situation is not supported by substantial evidence.

Commerce introduced a new fifth factor on remand, that the Korean Government's steel

industry restructuring efforts contributed to a particular market situation.  Remand

Redetermination at 25–26.  This analysis pertaining to the Korean Government's steel industry

restructuring efforts was never considered before by Commerce in its particular market situation

assessments.  The record here creates another temporal problem because reports of the industry

restructuring effort came several months after the OCTG II period of review concluded on

August 31, 2016.  Commerce cites a press release from the Korean Ministry of Strategy and

Finance announcing the Korean Government's "2017 Action Plan for Industrial Restructuring,"

dated January 25, 2017—five months after the period of review.  See id. at 25.  Commerce also

considered an article from Invest Chosun, noting that "[t]he *investment* industry is expressing the

opinion that additional restructuring is necessary."  Id. (emphasis added).  There is no record

---

[9]  In a countervailing duty investigation of hot-rolled steel flat products from Korea, this Court
upheld Commerce's finding that the Korean Government's provision of electricity to subject
producers for less than adequate remuneration did not confer a benefit.  POSCO v. United States,
42 CIT ___, 337 F. Supp. 3d 1265 (2018).  Commerce has made similar findings as to the
Korean Government's provision of electricity in countervailing duty investigations for other steel
products, which this Court has also upheld.  See, e.g., POSCO v. United States, 42 CIT ___, 353
F. Supp. 3d 1357 (2018) (sustaining in part Commerce's investigation of certain carbon and alloy
steel cut-to-length plate from Korea and noting that the "Korean electricity market is controlled
by a state-run monopoly"); POSCO v. United States, 42 CIT ___, 296 F. Supp. 3d 1320
(2018) (sustaining in part Commerce's countervailing duty investigation of cold-rolled steel flat
products from Korea); Maverick Tube Corp. v. United States, 41 CIT ___, 273 F. Supp. 3d 1293
(2017) (sustaining Commerce's countervailing duty investigation of welded line pipe from
Korea).

evidence here of any actual restructuring, nor evidence of government interference.  It was

unreasonable for Commerce to find that a government announcement of industry restructuring

efforts five months after the OCTG II period of review ended showed that "the conditions that

[led] to the government's announcement existed during the [OCTG II period of review]."  Id. at

26.  That is an untenable and speculative conclusion.  The court finds that Commerce's

determination that the Korean Government's steel industry restructuring demonstrates a

particular market situation in Korea is unsupported by substantial evidence.[10]

      The court concludes that Commerce's analysis and explanation of the five factors

supporting a particular market situation in Korea are unsupported by substantial record evidence,

both when viewing the five factors individually and collectively.  The court remands and directs

Commerce to reverse its finding of a particular market situation and to recalculate the mandatory

respondents' and non-examined companies' dumping margins.[11]

## B.  Classification of Proprietary SeAH Products

      SeAH disputes the classification of its proprietary OCTG products as grade 080—the

same code in the model-match hierarchy as American Petroleum Institute (API) Specification

5CT grade N-80.  SeAH Br. at 23 (asserting that SeAH has its own unique specification for an

---

[10] The court need not address NEXTEEL's procedural impropriety argument beyond mentioning that the mandatory respondents were given no notice that Commerce was considering whether steel industry restructuring efforts contributed to a particular market situation until this remand proceeding and were thus unable to submit factual information to rebut this new factor Commerce relied upon in finding a particular market situation in Korea.

[11] Plaintiffs challenged other aspects of Commerce's particular market situation finding, including Commerce's failure to conduct a respondent-specific analysis and the particular market situation adjustment based on the AFA rate from Hot-Rolled Steel Flats from Korea.  The court does not reach those issues.

OCTG product that has the same tensile strength but without the heat treatment found in N-80

grade code products).  SeAH faults "Commerce's attempt to equate the API grades with tensile

strength[,]" arguing that the record contradicts Commerce's methodology.  Id. at 24.

Even if comparing mechanical properties on the pipe, such as yield and tensile strength, and

discounting heat treatment, SeAH contends that its products could meet more than one model

grade code.  Id.  SeAH also argues that stenciling on OTCG products, which describes the

relevant grade, "is a physical characteristic that distinguishes different grades of pipe."  Id. at 26.

Defendant responds that Commerce's model-match hierarchy comparing physical

characteristics of products supports the basis for classifying SeAH's products as N-80 grade

products.  Def. Br. at 32.  Defendant asserts that SeAH's reliance on the absence of heat

treatment being a distinguishing characteristic that compels a different grade code is flawed

because Commerce's model-match methodology already captures heat treatment in a separate

field as the ninth model-match characteristic.  Id.; Remand Redetermination at 34–35.

Defendant also finds SeAH's characterization that Commerce "equate[d] API grades with tensile

strength[]" mistaken because "Commerce found that other than the absence of heat treatment,

SeAH did not identify any physical differences between N-80 grade products and its proprietary

products, which were designed specifically to compete with N-80 grade products."  Def. Br. at

32.

On remand, Commerce explained how the use of the model-match hierarchy supported a

finding that physical properties, such as grade, were valued higher than a production process

such as heat treatment.  Remand Redetermination at 72 (The "model-match methodology is not

intended to exactly align with API standards.").  The model-match methodology guided how

Commerce ranked product differences, with grade the third highest product characteristic, while heat treatment was the ninth highest.  Id. at 7.  Here, the sole difference between the products at issue was the absence of heat treatment in SeAH's products.  Id. at 31 ("[O]n this record, the absence of the heat treatment process is the sole distinguishing characteristic between N-80 grade products and SeAH's proprietary products.").  Commerce's model-match methodology recognized and captured heat treatment in a separate field.  Commerce explained that elevating heat treatment from ninth in its methodology above other model-match characteristics would cause similar products to be disregarded on heat treatment and result in Commerce comparing less similar products, which flouts the purpose of using the model-match methodology.  Id. at 31, 35.  The court accepts Commerce's explanation as reasonable.  The court declines SeAH's invitation to alter Commerce's methodology because the model-match hierarchy "capture[d] the similarities and differences (heat treatment) between SeAH's proprietary grades and the N-80 grade at the appropriate level in its hierarchy."  Remand Redetermination at 36.  Commerce's explanation for using its model-match methodology and reasons for combining SeAH's proprietary grades under reporting code 075 with 080 is supported by substantial evidence.  The court sustains Commerce's classification of SeAH's proprietary products.

## C.  Deduction of General and Administrative Expenses as U.S. Selling Expenses

In the Final Results, Commerce deducted the G&A expenses of SeAH's U.S. affiliate, PPA, from the price used to calculate constructed export price.  Final IDM at 89–90.  Commerce determined that "PPA's employees are responsible for overseeing and coordinating both sales and further manufacturing activities related to all subject products."  Id. at 90.  Commerce concluded that "PPA's G&A activities support the general activities of the company as a whole,"

as the activities included "(1) the sale and further manufacture or further manufactured products; and (2) the sale of non-further manufactured products." Id. Thus, Commerce applied PPA's G&A ratio to the cost of the imported pipe, irrespective of whether the pipe was manufactured in the United States and "attributed a portion of PPA's G&A activities, which includes selling functions, to the resold products." Id. The court remanded for clarification or reconsideration of Commerce's methodology and decision to deduct G&A expenses as being unsupported by substantial record evidence. NEXTEEL II, 392 F. Supp. 3d at 1293–94.

On remand, Commerce clarified its methodology and continued applying the G&A expense ratio to both PPA's resold and further manufactured products. Remand Redetermination at 38. Commerce examined PPA's activities and found that "it is significant that PPA is not performing further manufacturing on its own and does not maintain any production facilities for further manufacturing." Id. at 75. Commerce also found that these processes are performed by unaffiliated processors and "SeAH's involvement in further manufacturing is perfunctory in nature and is limited to paying a processing fee, which [Commerce] accounted for as a further manufacturing expense." Id. (noting that SeAH is "asking that PPA be treated the same as companies performing further manufacturing (which have production facilities, factory overhead and other significant expenses associated with further manufacturing) when *PPA is not performing further manufacturing*."). Apart from paying the already accounted-for processing fee, "SeAH is predominantly a selling entity and, thus it is reasonable to treat its G&A expenses as selling expenses." Id.

SeAH disputes "Commerce's reclassification of G&A expenses as selling expenses" because "Commerce has not explained how the allocation of G&A expenses to imported

products transforms them from G&A expenses to selling expenses."  SeAH Br. at 31.  Defendant

responds that the antidumping statute provides ample discretion in calculating U.S. prices using

the constructed export price methodology and that the controlling statute covering adjustments to

constructed export price, 19 U.S.C. § 1677a(d), affords discretion to allocate a selling entity's

G&A expenses.  Def. Br. at 34–35; see Maverick Br. at 11–12.

An antidumping duty represents the amount by which the normal value of the

merchandise exceeds its export price or constructed export price.  19 U.S.C. § 1673.  When, as

here, a foreign producer or exporter sells a product to a U.S. selling affiliate, the law permits

using "constructed export price" in calculating the dumping margin.  Id.  § 1677a(d).

Constructed export price is the price at which the subject merchandise is first sold in the United

States by a seller affiliated with the producer or exporter to a non-affiliated purchaser.  Id.

§ 1677a(b).

Commerce must deduct both the selling expenses and costs of further manufacture from

the price used to determine constructed export price.  Id. § 1677a(d).  One such expense is "the

cost of any further manufacture or assembly (including additional material and labor)[.]"  Id.

§ 1677a(d)(2).  Another is for expenses "incurred by or for the account of the producer or

exporter, or the affiliated seller in the United States, in selling subject merchandise[.]"  Id.

§ 1677a(d)(1).  The statute provides for deducting four categories of expenses incurred between

importation and resale: "(A) commissions for selling subject merchandise in the United States;"

(B) direct selling expenses; (C) any selling expenses that the seller pays the purchaser; and

"(D) *any selling expenses not deducted under subparagraph (A), (B), or (C)*[.]"  Id.

§ 1677a(d)(1)(A)–(D) (emphasis added).

In "calculating indirect selling expenses, Commerce generally will include G&A

expenses incurred by the United States selling arm of a foreign producer." Aramide

Maatschappij V.o.F. v. United States, 19 CIT 1094, 1101 (1995) ("Aramide").  "[I]ndirect selling

expenses . . . implicitly contemplate[] the exclusion of all expenses that relate to sales of non-

subject merchandise, as well as the exclusion of . . . all expenses that are entirely unrelated to

sales." U.S. Steel Corp. v. United States, 34 CIT 252, 266 (2010).  The court affords Commerce

deference in developing a methodology for including G&A expenses in the constructed value

calculation because it is a determination "involv[ing] complex economic and accounting

decisions of a technical nature[.]" Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed.

Cir. 1996) (citation omitted); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 48–49 (1983) (reiterating that Commerce must provide a cogent explanation supporting

its exercise of discretion).

Here, Commerce exercised its statutory discretion in allocating the G&A expenses of

SeAH's U.S affiliate, PPA, both to directly resold and further manufactured products upon

finding that PPA's G&A activities supported the general activities of the company.  Commerce

determined that "SeAH's involvement in further manufacturing is perfunctory in nature and is

limited to paying a processing fee, which [Commerce] accounted for as a further manufacturing

expense." Remand Redetermination at 75; see Def. Br. at 37–38 (asserting that "SeAH is a real

producer with real production facilities and significant factory overhead[,]" while "PPA is

essentially a paper company that produces nothing[]").  The unaffiliated processors' further

manufacturing expenses can reasonably be expected to incur G&A expenses funded by PPA's

fee. Remand Redetermination at 75.  Because Commerce already treats PPA's fee as a further

manufacturing expense, allocating a portion of PPA's G&A expenses to further manufacturing, as requested here by SeAH, would result in impermissible double counting.  Commerce's explanation of its accounting treatment methodology for classifying PPA's G&A expenses as indirect selling expenses and deducting the expenses when calculating constructed export price is reasonable and responsive to the court's request for clarification.  The court sustains Commerce's finding as to the treatment of SeAH's G&A expenses.

**IV.   CONCLUSION**

The court concludes that Commerce's particular market situation determination is not supported by substantial evidence.  The court also concludes that Commerce's classification of proprietary SeAH products and decision to deduct SeAH's G&A expenses as U.S. selling expenses are supported by substantial evidence.

Accordingly, it is hereby

**ORDERED** that the Remand Redetermination is remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that this case will proceed per the following schedule:

(1)  Commerce must file the second remand redetermination on or before August 18, 2020;

(2) Commerce must file the administrative record on or before September 1, 2020;

(3) Comments opposing the second remand redetermination must be filed on or before October 1, 2020;

(4) Comments in support of the second remand redetermination must be filed on

or before November 2, 2020; and

(5) The Joint Appendix must be filed on or before November 16, 2020.


/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    May 18, 2020
New York, New York