Slip Op. 23-52

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **NEXTEEL CO., LTD.,**<br><br>        **Plaintiff,**<br><br>**and**<br><br>**SEAH STEEL CORPORATION,**<br><br>        **Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>        **Defendant,**<br><br>**and**<br><br>**UNITED STATES STEEL CORPORATION, ET AL.,**<br><br>        **Defendant-Intervenors.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Consol. Court No. 18-00083** |

## <u>OPINION</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's third remand redetermination following the 2015–2016 administrative review of the antidumping duty order on oil country tubular goods from the Republic of Korea.]

Dated:  April 19, 2023

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff NEXTEEL Co., Ltd.

Jeffrey M. Winton, Amrietha Nellan, and Jooyoun Jeong, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff SeAH Steel Corporation.

Claudia Burke, Assistant Director, and Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel was Mykhaylo Gryzlov, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Thomas M. Beline, Myles S. Getlan, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White & Case LLP, of Washington, D.C., for Defendant-Intervenors Maverick Tube Corporation and Tenaris Bay City, Inc.

Choe-Groves, Judge:  Before the Court is the U.S. Department of Commerce's ("Commerce") third remand redetermination in the administrative review of the antidumping duty order on oil country tubular goods ("OCTG") from the Republic of Korea ("Korea") covering the period from September 1, 2015 to August 31, 2016.  See Commerce's Final Results of Redetermination Pursuant to Court Remand ("Third Remand Redetermination"), ECF No. 119-1, pursuant to Order, ECF No. 114; see also Certain Oil Country Tubular Goods From the Republic of Korea, 83 Fed. Reg. 17,146 (Dep't of Commerce Apr. 18, 2018) (final results of antidumping duty administrative review and final determination of no shipments; 2015–2016) ("Final Results"), and accompanying Issues and Decision

Memorandum for the Final Results of the 2015–2016 Administrative Review of

the Antidumping Duty Order on Certain Oil Country Tubular Goods from the

Republic of Korea (Apr. 11, 2018) ("Final IDM"), PR 368.[1]

In NEXTEEL Co. v. United States ("NEXTEEL IV"), 28 F.4th 1226 (Fed.

Cir. 2022), the U.S. Court of Appeals for the Federal Circuit ("CAFC") remanded

for Commerce to further consider whether a particular market situation could be

found based on any subset of the factors or other reasoning, and for proceedings

consistent with the CAFC's decision in Stupp Corp. v. United States ("Stupp"), 5

F.4th 1341 (Fed. Cir. 2021).  NEXTEEL IV, 28 F.4th at 1238–39, 41.

For the following reasons, the Court sustains in part and remands in part

Commerce's Third Remand Redetermination.

## BACKGROUND

The Court presumes familiarity with the facts and procedural history of this

case and recites the facts relevant to the Court's review of the Third Remand

Redetermination.  See NEXTEEL Co. v. United States ("NEXTEEL I"), 43 CIT

__, __, 392 F. Supp. 3d 1276, 1283–84 (2019); NEXTEEL Co. v. United States

("NEXTEEL II"), 44 CIT __, __, 450 F. Supp. 3d 1333, 1337–38 (2020);

---

[1]  Citations to the administrative record reflect the public administrative record
("PR") document numbers.  ECF Nos. 60, 94.

NEXTEEL Co. v. United States ("NEXTEEL III"), 44 CIT __, __, 475 F. Supp. 3d 1378, 1380–81 (2020).

In this administrative review of OCTG from Korea, Commerce selected Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") and Consolidated Plaintiff SeAH Steel Corporation ("SeAH") as mandatory respondents for individual examination. See NEXTEEL I, 43 CIT at __, 392 F. Supp. 3d at 1283.

In NEXTEEL Co. v. United States ("NEXTEEL I"), 43 CIT __, 392 F. Supp. 3d 1276 (2019), the Court sustained in part and remanded in part the Final Results. NEXTEEL I, 43 CIT at __, 392 F. Supp. 3d at 1297. In NEXTEEL Co. v. United States ("NEXTEEL II"), 44 CIT __, 450 F. Supp. 3d 1333 (2020), the Court sustained in part and remanded in part the Remand Redetermination. NEXTEEL II, 44 CIT at __, 450 F. Supp. 3d at 1346–47; see Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 81-1, pursuant to Order, ECF No. 73. In NEXTEEL Co. v. United States ("NEXTEEL III"), 44 CIT __, 475 F. Supp. 3d 1378 (2020), the Court sustained the Second Remand Redetermination. NEXTEEL III, 44 CIT at __, 475 F. Supp. 3d at 1380; see Commerce's Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF No. 96-1, pursuant to Order, ECF No. 95. In NEXTEEL IV, the CAFC directed the Court to remand to Commerce to further consider whether a particular market situation

could be found based on any subset of the factors or other reasoning, and for

proceedings consistent with the CAFC's decision in Stupp.  NEXTEEL IV, 28

F.4th at 1238–39, 41.

In the Third Remand Redetermination, Commerce reconsidered the record

and determined that substantial evidence did not support the conclusion that a

particular market situation existed in Korea during the period of review.  Third

Remand Redetermination at 11–12, 16.  Commerce also reconsidered the

differential pricing analysis and provided further explanation regarding

Commerce's application of the Cohen's $d$ test to SeAH's U.S. sales.  Id. at 16–21,

57–73.  Commerce determined that the weighted-average dumping margins

calculated in the Second Remand Redetermination would remain the same.  Id. at

74.

NEXTEEL filed Plaintiff NEXTEEL Co., Ltd.'s Comments on Remand

Redetermination, in which Plaintiff raises concerns but argues that Commerce's

Third Remand Redetermination should be sustained.  Pl.'s Cmts. on Remand

Redetermination ("Pl.'s Br."), ECF No. 122.  SeAH filed two briefs, Comments of

SeAH Steel Corporation in Partial Opposition to Commerce's October 21, 2022,

Redetermination and Comments of SeAH Steel Corporation in Partial Support of

Commerce's October 21, 2022, Redetermination, in which SeAH argues that

Commerce's differential pricing analysis should be remanded and its particular

market situation analysis should be sustained.  Cmts. SeAH Part. Opp'n

Commerce's Oct. 21, 2022 Redetermination ("Consol. Pl.'s Part. Opp'n Br."), ECF

Nos. 123, 124; Cmts. SeAH Part. Supp. Commerce's October 21, 2022

Redetermination ("Consol. Pl.'s Part. Supp. Br."), ECF No. 126.  Defendant-

Intervenor United States Steel Corporation ("Defendant-Intervenor" or "U.S.

Steel") filed United States Steel Corporation's Comments in Partial Opposition to

Remand Results, arguing that Commerce's particular market situation analysis

should be remanded.  Def.-Interv.'s Cmts. Part. Opp'n Remand Results ("Def.-

Interv.'s Br."), ECF No. 121.  Defendant filed Defendant's Response to Comments

Regarding the Remand Redetermination.  Def.'s Resp. Cmts. Regarding Remand

Redetermination ("Def.'s Br."), ECF No. 125.  NEXTEEL filed Plaintiff Nexteel

Co., Ltd.'s Reply Comments on Remand Redetermination.  Pl.'s Reply Cmts.

Remand Redetermination, ECF No. 127.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final results of an administrative review of an antidumping duty order.  The Court

will hold unlawful any determination found to be unsupported by substantial

record evidence or otherwise not in accordance with the law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Particular Market Situation

Commerce determines antidumping duties by calculating the amount by

which the normal value of subject merchandise exceeds the export price or the

constructed export price for the merchandise.  19 U.S.C. § 1673.  When reviewing

antidumping duties in an administrative review, Commerce must determine: (1) the

normal value and export price or constructed export price of each entry of the

subject merchandise, and (2) the dumping margin for each such entry.  Id.

§ 1675(a)(1)(B), (a)(2)(A).

The statute dictates the steps by which Commerce may calculate normal

value "to achieve a fair comparison" with export price or constructed export price.

Id. § 1677b(a).  When Commerce looks to determine normal value in accordance

with 19 U.S.C. § 1677b, if Commerce concludes that it must resort to using

constructed value under 19 U.S.C. § 1677b(e), and that a "particular market

situation" exists "such that the cost of materials and fabrication or other processing

of any kind does not accurately reflect the cost of production in the ordinary course

of trade," the statute authorizes Commerce to use any other reasonable calculation

methodology.  Id. § 1677b(e).  The origin in the statute of "particular market

situation" is its inclusion in the framework of "normal value" when the Tariff Act

of 1930 was amended by the Uruguay Round Agreements Act.  See Pub. L. 103-

465, § 224, 108 Stat. 4809, 4878 (1994);[2] cf. Trade Preferences Extension Act of

2015 ("TPEA"), Pub. L. No. 114-27, 129 Stat. 362 (2015) (adding the concept of a

particular market situation in the definition of the term "ordinary course of trade"

for purposes of constructed value and clarifying remedial action if Commerce finds

the existence of a particular market situation).  The Trade Preferences Extension

Act of 2015 amended certain subsections of the Tariff Act of 1930.  See TPEA,

Pub. L. No. 114-27, 129 Stat. 362.  Section 504 of the TPEA permits Commerce to

consider certain sales and transactions "to be outside the ordinary course of trade"

when "the particular market situation prevents a proper comparison with the export

price or constructed export price."  19 U.S.C. § 1677(15).  When calculating

constructed value under the revised statute, if Commerce finds an extant particular

market situation, "such that the cost of materials and fabrication or other

processing of any kind does not accurately reflect the cost of production in the

---

[2] See also Agreement on Implementation of Article VI of the General Agreement
on Tariffs and Trade 1994, Art. 2.2 ("[w]hen there are no sales of the like product
in the ordinary course of trade in the domestic market of the exporting country or
when, because of the particular market situation or the low volume of the sales in
the domestic market of the exporting country[ ], such sales do not permit a proper
comparison, the margin of dumping shall be determined by comparison with a
comparable price of the like product when exported to an appropriate third country,
provided that this price is representative, or with the cost of production in the
country of origin plus a reasonable amount for administrative, selling and general
costs and for profits") (footnote omitted).

ordinary course of trade, the administering authority may use another calculation

methodology under this subtitle or any other calculation methodology."  Id.

§ 1677b(e).  Congress did not define "particular market situation" in 1994 or 2015,

but as observed in NEXTEEL IV, § 1677b(e) plainly "identifies the factual support

Commerce must provide to invoke this provision."  NEXTEEL IV,  28 F.4th at

1234.  Congress also provided examples in adopting the Statement of

Administrative Action:

> The [Antidumping] Agreement does not define "particular market
> situation," but such a situation might exist where a single sale in the
> home market constitutes five percent of sales to the United States or
> where there is government control over pricing to such an extent that
> home market prices cannot be considered to be competitively set.  It
> also may be the case that a particular market situation could arise from
> differing patterns of demand in the United States and in the foreign
> market.  For example, if significant price changes are closely correlated
> with holidays which occur at different times of the year in the two
> markets, the prices in the foreign market may not be suitable for
> comparison to prices to the United States.

Statement of Administrative Action, H.R. REP. No. 103-316, vol. 1, at 822 (1994),

as reprinted in 1994 U.S.C.C.A.N. 4040, 4162.  "These are all situations in which

some circumstance distorts costs so that they are not set based on normal market

forces or do not move with the rest of the market."  NEXTEEL IV, 28 F.4th at

1234.

The CAFC found that three of the five particular market situation factors

were not supported by substantial evidence: the Korean Government's subsidies to

hot-rolled coil ("HRC") producers, strategic alliances, and steel industry

restructuring.  Id. at 1234–38.  The CAFC noted that "Commerce has not taken a

clear position on whether it believes the other two circumstances alone are

sufficient" and that "it is far from a foregone conclusion that Commerce would

have found a particular market situation based on these two factors alone."  Id. at

1237.  The CAFC stated:

> In summary, we agree with the Court of International Trade that
> substantial evidence does not support the existence of a particular
> market situation created by Commerce's five enumerated
> circumstances.  Because we are limited to reviewing Commerce's
> reasoning, we do not decide whether a particular market situation could
> be found based on any subset of the factors or other reasoning.

Id. at 1241.

The Parties focus on whether the CAFC issued an open-ended remand and to

what extent Commerce should have been bound to follow the CAFC's holdings in

NEXTEEL IV.  See, e.g., Def.-Interv.'s Br.; Pl.'s Br.; Def.'s Br.  On remand,

Commerce acknowledged that, "the CAFC left open the possibility that a

[particular market situation] could be found based on an analysis of any subset of

the factors or other reasoning.  Thus, the CAFC ruled that Commerce may seek to

justify a [particular market situation] finding on remand."  Third Remand

Redetermination at 6–7.  Commerce did not reopen the record on remand, but

reexamined the existing record.  Id. at 8, 36–37.  Whether to reopen the record is a

matter for Commerce's discretion, and the Court concludes that Commerce's

determination to not reopen the record was reasonable.  See Essar Steel Ltd. v.

United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the

record is best left to the agency."); Changshan Peer Bearing, Co. v. United States,

38 CIT __, __, 953 F. Supp. 2d 1354, 1362 (2014) ("[T]he court views an order

compelling an agency to reopen an administrative record on remand as the

exception rather than the rule, consistent with the principle that courts, as a general

matter, should allow agencies to exercise discretion as to whether to reopen an

administrative record on remand.").

### A.    HRC Imports from China

Defendant-Intervenor alleges that Commerce presumed impermissibly in its

Third Remand Redetermination that the CAFC "mandated Commerce to reach

certain evidentiary conclusions."  Def.-Interv.'s Br. at 2.  Defendant-Intervenor

focuses on Commerce's statement that:

> In [NEXTEEL IV], however, the CAFC held "[a]lthough low-priced
> Chinese steel could contribute to a particular market situation, the
> record does not show sufficient particularity for this circumstance to
> create a particular market situation on its own."  While we respectfully
> disagree with the CAFC that the evidence does not show sufficient
> particularity for this factor to establish a [particular market situation]
> on its own, the CAFC's holding is binding in this case.

Third Remand Redetermination at 57 (internal citation omitted); Def.-Interv.'s Br.

at 2.  This statement appears in Commerce's Third Remand Redetermination and

seemingly indicates that Commerce believes that the evidence of low-priced Chinese steel could support a particular market situation determination on its own, absent instructions from the CAFC to the contrary.

The CAFC's remand directions were open-ended, stating that, "we do not decide whether a particular market situation could be found based on any subset of the factors or other reasoning." NEXTEEL IV, 28 F.4th at 1241.  The CAFC also stated, however, that, "[a]lthough low-priced Chinese steel could contribute to a particular market situation, the record does not show sufficient particularity for this circumstance to create a particular market situation on its own." Id. at 1237.  The CAFC did not make specific evidentiary rulings with respect to the issues of low-price Chinese products and Korean electricity, but instead remanded for Commerce to conduct its analysis again without further parameters.  Id. at 1241.

Commerce determined that evidence placed on the record by Maverick Tube Corporation and U.S. Steel demonstrated that imports of low-priced Chinese steel *could* contribute to the existence of a particular market situation.  Third Remand Redetermination at 12.  Commerce considered that evidence on the record demonstrated that the Chinese government highly subsidized steel products and that distortions in the Chinese economy resulted in significant overcapacity.  Id. at 12–13.  Commerce referenced the Official Journal of the European Union, which estimated that in 2015, China accounted for 50.3 percent of the world's actual

crude steel production and that China's steel production overcapacity was estimated at 350 million metric tons.  Id. at 13.  Commerce considered the Government of Korea's estimate that China's steel production overcapacity was 450 million metric tons in 2015 and accounted for 60 percent of global steel production overcapacity.  Id.

Commerce determined that data submitted on the record demonstrated that an increase in Chinese exports of steel products *may have* created downward pressure on steel prices in Korea.  Id. at 14.  Commerce referenced data from the Korean Iron & Steel Association showing that from 2011 to 2015, Korean imports of Chinese steel products rose from 10,200,000 metric tons (mt) to 13,740,000 mt, representing a 35 percent increase.  Over the same time period, Commerce noted that steel imports from China increased their Korean market share from 18 percent to 25 percent.  Id.  Commerce considered that in 2015, the price differential between Korean-produced hot-rolled steel and Chinese-produced hot-rolled steel was U.S. dollars (USD) 118 per mt; as a result, Korean producers of hot-rolled steel found it increasingly difficult to operate profitably.  Id.  Commerce considered further data from the Global Trade Atlas ("GTA") showing that Chinese exports of hot-rolled carbon and alloy steel products to Korea increased from 3,156,607,961 kilograms (kg) in 2012 to 3,820,686,369 kg in 2016, representing a 21 percent increase and that over the same time period, the average

unit value of Chinese exports of hot-rolled carbon and alloy steel products to Korea
fell from USD 544.34 per mt to USD 313.08 per mt, representing a 43 percent
decrease.  Id.  Commerce determined that Chinese steel production overcapacity
resulted in an increase in Chinese steel exports to Korea and a drastic decline in
average unit values from China.  Id.

        Commerce determined that the record evidence demonstrated that "imports
of low-priced Chinese steel *could potentially* contribute to a [particular market
situation]."  Id. (emphasis added).  Notably, Commerce did not determine that the
record evidence showed sufficient particularity to the Korean market to support a
particular market situation.  The Court observes that Commerce used tentative
language such as "*could contribute* to the existence of a [particular market
situation]," "*may have* created downward pressure," and "*could potentially*
contribute to a [particular market situation]," without stating that the overcapacity
of Chinese steel imports *definitively* created a particular market situation.  Id.
Commerce stated that, "[a]ccordingly, although we are concluding on remand that
a [particular market situation] is not supported by substantial evidence for this
particular [period of review] on this record, we also acknowledge that in a future
determination Commerce may find a [particular market situation] based on this
factor if the evidence demonstrates sufficient particularity."  Id. at 16.

The Court agrees with Commerce's determination that the record evidence does not show that an increase in Chinese steel exports was particular to Korea and the drastic decline in average unit values from China was particular to Korea. Although the CAFC issued an open-ended remand, the Court concludes that it was reasonable for Commerce in its <u>Third Remand Redetermination</u> to follow the CAFC's direction that the evidence on the record regarding low-priced Chinese steel did not establish with sufficient particularity a particular market situation in Korea on its own, especially given Commerce's decision to not reopen the record. Moreover, the Court is persuaded because Commerce conducted a full evaluation of the record evidence on remand and determined that substantial evidence on the record did not support a particular market situation in Korea. The Court sustains Commerce's determination that record evidence of low-priced Chinese steel did not support a particular market situation determination in Korea.

### B.     Korean Electricity Market

Commerce determined that there was insufficient evidence on the record to establish that the Government of Korea's involvement in the Korean electricity market contributed to a particular market situation in Korea during the period of review. <u>Third Remand Redetermination</u> at 6–16. Commerce did not reopen the record on remand but reexamined the record to perform its particular market situation analysis. <u>Id.</u> For example, Commerce examined several record

documents that supported Commerce's determination that the Korean Government

heavily monitored and regulated the electricity rates of the Korea Electric Power

Corporation.  See Maverick Tube Corporation's Letter, "Certain Oil Country

Tubular Goods from the Republic of Korea: Other Factual Information Submission

for Valuing the Particular Market Situation in Korea," (May 4, 2017) ("Particular

Market Situation Allegation"), PR 95–113; id. at Ex. 3 (Maverick Tube

Corporation's Letter, "Oil Country Tubular Goods from the Republic of Korea:

Submission of Factual Information" (Nov. 13, 2015)) at Ex. X-13 (Government of

Korea's Letter, "Response of the Government of Korea to the Department of

Commerce's Questionnaire January 21, 2015 Welded Line Pipe From the Republic

of Korea [Countervailing Duty] Original Investigation," (January 21, 2015)) at I–

34; id. at Ex. 5 (Electricity [Particular Market Situation] Allegation Letter) at Ex.

4.  Commerce determined that this evidence demonstrated that government policy

controlled Korean electricity prices and that the Government of Korea may have

intervened in the electricity market and distorted electricity prices in order to

achieve policy goals such as controlling inflation, but that there was insufficient

evidence to demonstrate that Korean electricity prices were distorted during the

period of review.  Third Remand Redetermination at 9–10.

Commerce considered a report from the International Energy Agency

("IEA") showing that in 2016, the median industrial electricity price including

taxes among IEA members was 6.97 British pence (pence) per kilowatt hour

(kWh) and the Korean industrial electricity price including taxes was 6.965 pence

per kWh, nearly identical to the median IEA electricity rate.  Id. at 10.  Commerce

determined that Korean industrial electricity prices (including taxes) were, on

average, in line with the median of electricity rates in other countries in 2016.  Id.

Commerce determined that the same report showed that Korea's annual industrial

electricity prices were approximately 43 percent lower than electricity prices in

Japan.  Id.  Commerce determined that although Japan and Korea were the only

two countries located in Asia included in the IEA study, there were variables other

than geographic location that factored into identifying an appropriate comparison.

Id.  Commerce determined that the record evidence demonstrated that shortly

before the relevant period, Japan changed its energy consumption make-up by

transitioning from nuclear energy to liquid natural gas, which explained why

Japan's prices were significantly higher than the median electricity prices of all

countries in the IEA study.  Id. at 10–11.  Commerce determined that without

sufficient evidence on the record of this review demonstrating that Japanese

electricity rates were the most appropriate comparison for Korean electricity rates,

the median industrial electricity rate among IEA members was a better comparison

for Korea's electricity rates.  Id. at 11.  Commerce considered that this comparison,

which used a median of the broader scope of electricity price data, was less likely

to have results affected by market peculiarities or distortions in any single country.
Id.

The Court concludes that Commerce was not required to compare Korea's electricity rates with Japan's electricity rates because Commerce's explanation was reasonable for why Japan's prices were significantly higher than the median electricity prices of all countries in the IEA study. The Court also concludes that Commerce's decision to use a comparison with the median industrial electricity rate among IEA members was reasonable given Commerce's explanation that the comparison provided the median of the broader scope of electricity price data and was less likely to have results affected by market peculiarities or distortions specific to a particular country.

Because Commerce's comparison of Korea's electricity rates with the median industrial electricity rate among IEA members was reasonable and Commerce's determination that Korean industrial electricity prices (including taxes) were, on average, in line with the median of electricity rates in other countries in 2016 was supported by substantial evidence, the Court sustains Commerce's determination that there was insufficient evidence on the record to establish that the Government of Korea's involvement in the Korean electricity market contributed to a particular market situation in Korea during the period of review.

## II.     Commerce's Differential Pricing Analysis

In NEXTEEL IV, the CAFC directed that the Second Remand

Redetermination be remanded for Commerce to reconsider the use of the Cohen's

$d$ test in view of the Stupp opinion.  NEXTEEL IV, 28 F.4th at 1239.  On remand,

Commerce continued to apply the Cohen's $d$ test and determined that the statistical

assumptions identified by the CAFC in Stupp were not pertinent to Commerce's

analysis, which considered an entire population and did not rely on sampling.

Third Remand Redetermination at 16–21, 57–73.  SeAH opposes the Third

Remand Redetermination in part, arguing that Commerce failed to support its use

of a 0.8 threshold in its application of the Cohen's $d$ test, abused its discretion in

not considering academic literature relied on by the CAFC in NEXTEEL IV, and

improperly relied on Commerce's analysis in the Final Results of Redetermination

Pursuant to Court Remand ("Stupp Remand Redetermination") filed in Stupp

Corp. v. United States, Court No. 15-00334.  Consol. Pl.'s Part. Opp'n Br. at 2–13;

see Stupp Remand Redetermination, Court No. 15-00334, ECF No. 208-1.

Defendant contends that Commerce supported its use of the Cohen's $d$ test and

SeAH has not provided a basis for a fourth remand.  Def.'s Br. at 16–31.

### A.     Commerce's Use of the 0.8 Threshold

Commerce utilizes the Cohen's $d$ test to measure differences in prices

between two groups relative to the variance in prices within those groups.  Third

Remand Redetermination at 18.  When the differences in the means measured

relative to the variances, the Cohen's *d* coefficient, is found to be 0.8 or greater, the

difference is considered "large" and "significant."  Id.  SeAH contends that

because the CAFC expressed concern regarding the use of the 0.8 threshold to

interpret data that did not follow the statistical assumptions of normality, sufficient

observation size, and roughly equal variances, Commerce was required to explain

its use of the 0.8 threshold in the Third Remand Redetermination.  Consol. Pl.'s

Part. Opp'n Br. at 3–5.  SeAH argues that Commerce did not provide an

explanation for the reasonableness of the 0.8 threshold and, instead, based its

determination on the inapplicable case Mid Continent Steel & Wire, Inc. v. United

States ("Mid Continent"), 940 F.3d 662 (Fed. Cir. 2019).  Id. at 4–6.  Defendant

contends that Commerce provided a reasonable explanation for its use of the 0.8

threshold and addressed the concerns raised by the CAFC.  Def.'s Br. at 19–23.

Defendant asserts that Commerce's citation to Mid Continent was not dispositive,

and that Commerce also relied on Stupp to support its use of the 0.8 threshold.  Id.

at 23.

       In Stupp, the CAFC observed that the Cohen's *d* test was based on certain

statistical assumptions, including the normality, sufficient size, and roughly equal

variances of the considered populations.  Stupp, 5 F.4th at 1357–58.  The CAFC

expressed concern that Commerce's methodology disregarded these statistical

assumptions and remanded Commerce's determination with instructions for

"Commerce to clarify its argument that having the entire universe of data rather

than a sample makes it permissible to disregard the otherwise-applicable

limitations on the use of the Cohen's d test." Id. at 1357–60.  The CAFC cited

these concerns in its remand of this case.  NEXTEEL IV, 28 F.4th at 1238–39.

 In the Third Remand Redetermination, Commerce explained the purpose of

the Cohen's *d* test:

> Section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the
> Act) requires that Commerce find that there exists a pattern of prices
> that differ significantly for comparable merchandise among purchasers,
> regions, and time periods.  As part of Commerce's "differential pricing
> analysis," the "Cohen's *d* test" examines whether, for comparable
> merchandise, the prices to a particular purchaser, region, or time period
> differ significantly from all other prices.  The Cohen's *d* test is based
> on the concept of "effect size" which measures the difference in the
> means of some measurement between two groups relative to the
> variance in that measurement within each of the two groups.  In effect,
> the denominator of this ratio is the "yardstick" by which the difference
> in the means is measured.  When this difference in the means relative
> to the variances within the underlying data, i.e., the effect size or the
> "Cohen's *d* coefficient," is found to be "large," i.e., 0.8 or larger, then
> the difference in the prices is found to be "significant."

Third Remand Redetermination at 18 (internal citations omitted).

 In its analysis, Commerce relied on Mid Continent to support its

determination that the CAFC had previously affirmed the reasonableness of the 0.8

threshold to determine whether price differences were significant.  Id. at 19–20

(citing Mid Continent, 940 F.3d at 673).  In Mid Continent, the CAFC held that

Commerce was within "the wide discretion left to it under 19 U.S.C. § 1677f-1(d)(1)(B)" in adopting the 0.8 threshold because:

> Commerce reasoned that even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation; the 0.8 standard is "widely adopted" as part of a "commonly used measure" of the difference relative to such overall price dispersion; and it is reasonable to adopt that measure where there is no better, objective measure of effect size.

Mid Continent, 940 F.3d at 673.  In Stupp, the CAFC recognized that Mid Continent had resolved the issue of whether Commerce's adoption of the 0.8 threshold was reasonable but did not reach the question of whether the 0.8 threshold could be applied when the data did not satisfy the statistical assumptions of the Cohen's *d* test.  Stupp, 5 F.4th at 1356–57.

On remand, Commerce determined that the statistical assumptions are not relevant to Commerce's application of the Cohen's *d* test to SeAH's price data.  Third Remand Redetermination at 20.  Specifically, Commerce explained that:

> Such criteria, i.e., the normality of the distribution, equal variances and the number of observations (i.e., the sample size), are relevant to determine whether the results of an analysis based on a sample are representative of the full population as a whole.  The results of an analysis based on sampled data are estimates of the actual values of the parameters for the full population, and using statistical inference based on these statistical characteristics of the sampled data will determine, with predefined criteria, whether the estimates in the analysis results represent the actual values of the parameters for the full population of data.

Id.  This explanation does not resolve the CAFC's concerns raised in Stupp pertaining to the use of the 0.8 threshold when the statistical assumptions are not observed.  As the CAFC observed, "Professor Cohen derived his interpretive cutoffs under certain assumptions.  Violating those assumptions can subvert the usefulness of the interpretive cutoffs, transforming what might be a conservative cutoff into a meaningless comparator."  Stupp, 5 F.4th at 1360.  The Court remands for reconsideration or further discussion the issue of Commerce's calculation and application of the 0.8 threshold in Cohen's $d$ analysis.

### B.    Consideration of Academic Material

In Stupp, the CAFC cited academic literature discussing the statistical assumptions of the Cohen's $d$ test.  See id. at 1357–59.  Commerce determined that it did not need to address this academic literature in the Third Remand Redetermination because the academic literature was not on the administrative record for this case.  Third Remand Redetermination at 60–63, 68.  SeAH argues that "Commerce was, at a minimum, required to engage with the academic literature that the CAFC took judicial notice of and cited in the Stupp decision."  Consol. Pl.'s Part. Opp'n Br. at 7.  SeAH contends that because Commerce did not reject references to the academic literature in SeAH's administrative case brief and referenced the materials in the Final IDM, the texts are part of the administrative

record.  Id. at 7–9.  SeAH also argues that Commerce abused its discretion by not

reopening the administrative record on remand to permit the academic literature to

be placed on the record.  Id. at 9–11.

Defendant contends that the Stupp decision and the Court's remand did not

require Commerce to address the academic literature cited by the CAFC.  Def.'s

Br. at 25–26.  Defendant also argues that SeAH is precluded from challenging

Commerce's decision to not reopen the administrative record because SeAH did

not request that the administrative record be reopened on remand and failed to

exhaust its administrative remedies.  Id. at 24.  If the arguments are not barred by

exhaustion, Defendant argues, then SeAH has failed to demonstrate that

Commerce abused its discretion in not reopening the administrative record and that

SeAH did not carry its burden to build an adequate record.  Id. at 24–25.

Defendant asserts that Commerce's failure to reject citations to academic literature

in SeAH's case brief and references to the academic literature in the Final IDM

were in error and did not result in the academic literature being placed on the

administrative record.  Id. at 26–29.

The Court remanded this matter to Commerce for further proceedings in

conformity with the CAFC's decision in NEXTEEL IV.  In NEXTEEL IV, the

CACF held that "[b]ecause Commerce's use of Cohen's *d* here presents identical

concerns to those in Stupp, we vacate this portion of [NEXTEEL III] and remand

to the Court of International Trade to reconsider in view of <u>Stupp</u>."  <u>NEXTEEL IV</u>,

28 F.4th at 1239.  In <u>Stupp</u>, the CAFC considered multiple academic sources

addressing the statistical assumptions underlying the Cohen's $d$ test.  <u>Stupp</u>, 5 F.4th

at 1357–59.  The CAFC directed the Court to remand Commerce's determination:

> to give Commerce an opportunity to explain whether the limits on the
> use of the Cohen's $d$ test prescribed by Professor Cohen and other
> authorities were satisfied in this case or whether those limits need not
> be observed when Commerce uses the Cohen's $d$ test in less-than-fair-
> value adjudications.  In that regard, we invite Commerce to clarify its
> argument that having the entire universe of data rather than a sample
> makes it permissible to disregard the otherwise-applicable limitations
> on the use of the Cohen's $d$ test.

<u>Id.</u> at 1360.

Though the CAFC relied on academic literature in <u>Stupp</u>, the CAFC did not

instruct Commerce to directly respond to the specific sources of information.

Rather, the CAFC directed the remand in <u>Stupp</u> to allow Commerce an opportunity

to discuss whether statistical limitations on the Cohen's $d$ test were satisfied or

relevant to Commerce's analysis when an entire universe of data was considered.

<u>See</u> <u>id.</u>  Though the statistical limitations were drawn from academic literature,

Commerce was not required by the CAFC to incorporate the academic literature

into its response.  Commerce explained why statistical assumptions, such as

normality, sufficient observation size, and roughly equal variances, are not relevant

when the population considered consists of the total universe of data.  Third

Remand Redetermination at 20–21, 58–60.

SeAH cited certain academic texts in its administrative case brief to

Commerce.  See SeAH's Admin. Case Br. (Nov. 30, 2017) at 30–34, PR 319.

Commerce cited to some of these academic texts in the Final IDM.  See Final IDM

at 67–72.  In the Third Remand Redetermination, Commerce determined that it

could not consider the relevant academic literature because the documents were not

included on the administrative record.  Id. at 60–63.  In the Third Remand

Redetermination, Commerce claimed that it did not realize that the academic texts

cited in SeAH's administrative case brief were not on the administrative record

during the initial review and conceded that discussion of the academic literature in

the Final IDM was an oversight that "may have resulted from the discussion and

analysis of such texts in the final results of the preceding first administrative

review of this [antidumping duty] order, where the academic texts were part of the

record of the first review."  Third Remand Redetermination at 62 & n.284.

Commerce claimed that the discussion "had been simply copied from the final

results of the first review" and that it was "clarifying this oversight" on remand.

Id.  Commerce determined that "[s]uch an oversight by Commerce does not negate

either Commerce's need to maintain the boundaries of an administrative record or

to enforce the time limits for the submission of [new factual information]

consistent with 19 CFR § 351.301." Id. at 62.

SeAH contends that Commerce's reliance on the cited academic literature in

the Final IDM effectively placed the academic literature on the administrative

record.  Consol. Pl.'s Part. Opp'n Br. at 7–9.  In support of its argument, SeAH

cites to Clearon Corp. v. United States, 38 CIT 1122 (2014).  Id. at 8.  In Clearon

Corp., Commerce used the World Development Report in selecting a surrogate

country, but a copy of the World Development Report was not included in the

administrative record.  Clearon Corp., 38 CIT at 1147.  The Court held that

because Commerce relied upon the World Development Report as factual

information in reaching its determination, the document was part of the record and

directed Commerce to add the document to the record so that the Court could

determine the reasonableness of Commerce's determination.  Id.  Defendant argues

that the instant case is more analogous to another situation considered in Clearon

Corp., in which Commerce considered information from a 2010 financial statement

but referenced a 2011 financial statement inadvertently.  Def.'s Br. at 28; Clearon

Corp., 38 CIT at 1132.

Here, Commerce discussed SeAH's argument and the supporting academic

literature in the context of whether the application of the Cohen's $d$ coefficient and

0.8 threshold were reasonable.  Final IDM at 67–72.  Commerce's detailed

response to the argument was more significant than a simple typographic error. Because Commerce relied on the academic literature cited in SeAH's administrative case brief in its analysis supporting the <u>Final Results</u>, the Court concludes that Commerce effectively made the academic literature part of the administrative record. Commerce's attempt to retroactively explain the consideration of the academic literature as an oversight does not excuse Commerce's failure to consider the evidence in the <u>Third Remand Results</u>. The Court remands this matter to Commerce for reconsideration of the academic literature cited in the Final IDM.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that this action is sustained in part and remanded in part to Commerce for reconsideration consistent with this opinion, and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) SeAH shall place on the administrative record on or before April 26, 2023 copies of academic literature cited by Commerce in the Final IDM;

(2) Commerce shall file its fourth remand determination on or before June 20, 2023;

(3) Commerce shall file the administrative record on or before July 5, 2023;

Consol. Court No. 18-00083                                                     Page 29

(4) Comments in opposition to the fourth remand determination shall be filed

   on or before August 2, 2023;

(5) Comments in support of the fourth remand determination shall be filed

   on or before August 30, 2023; and

(6) The joint appendix shall be filed on or before September 27, 2023.


                                                      /s/ Jennifer Choe-Groves
                                                   Jennifer Choe-Groves, Judge

Dated:      April 19, 2023
            New York, New York