UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| NEXTEEL CO., LTD., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| and | ) |
|  | ) |
| SEAH STEEL CORPORATION, | ) |
|  | ) |
| Consolidated Plaintiff, | ) |
|  | ) |
| v. | ) Consol. Court No. 18-00083 |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant, | ) |
|  | ) |
| and | ) |
|  | ) |
| UNITED STATES STEEL CORPORATION, | ) |
| MAVERICK TUBE CORPORATION, AND | ) |
| TENARISBAYCITY, | ) |
|  | ) |
| Defendant-Intervenors. | ) |

COMMENTS OF SEAH STEEL CORPORATION
IN OPPOSITION TO
COMMERCE'S JUNE 27, 2023, REDETERMINATION

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER REMOVED FROM PAGE 12

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

August 9, 2023

Table of Contents

Page

INTRODUCTION ........................................................................................................ 2

ARGUMENT ............................................................................................................. 5

   A.   The Interpretation of a Calculated Value of Cohen's *d*
       Requires that the Statistical Assumptions of Normality,
       Equal Variances, and Sufficient Data Be Satisfied Whether
       the Data Consists of a Sample or an Entire Population ........................................ 5

   B.   The Thresholds Established by Professor Cohen
       Were Based on an Analysis of Populations
       that Meet Specific Statistical Criteria .................................................................. 8

       1.   The Thresholds Established by Professor
           Cohen Were Based on an Analysis that
           Assumed the Data Satisfied the Assumptions of
           Normality, Equal Variances, and Sufficient Data ........................................ 9

       2.   The Real-World Examples Cited by
           Professor Cohen Came from Statistical
           Studies of Normally-Distributed Data ........................................................ 11

   C.   Commerce's Use of Cohen's Threshold is Not "Reasonable" or
       Consistent With its "Widely Accepted" Use by Academics .............................. 13

       1.   Cohen Explained the Limitations of the
           Reasonable Use of the Proposed Thresholds ............................................. 13

       2.   Professor Cohen's Thresholds Are Not
           "Widely" Used when His Statistical
           Assumptions Are Not Satisfied .................................................................. 15

CONCLUSION ........................................................................................................ 16

Table of Authorities

Page

COURT DECISIONS

*Essar Steel, Ltd. v. United States*,
753 F.3d 1368 (Fed. Cir. 2014) ................................................................... 1-2

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019) .......................................................................16

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ..........................................................................3

*Stupp Corp. v. United States*,
619 F. Supp. 3d 1314 (CIT 2023) ...................................................................6

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., <br><br> Plaintiff, <br><br> and <br><br> SEAH STEEL CORPORATION, <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, AND TENARISBAYCITY, <br><br> Defendant-Intervenors. | Consol. Court No. 18-00083 |

COMMENTS OF SEAH STEEL CORPORATION
IN OPPOSITION TO
COMMERCE'S JUNE 27, 2023, REDETERMINATION

This brief is submitted on behalf of SeAH Steel Corporation to comment on the

Redetermination on Remand (the "Fourth Redetermination") filed by the Department of

Commerce on June 27, 2023, in the above-captioned case.[1]

_____

[1] We note that Commerce failed to provide a draft of the Fourth Redetermination for parties to comment on at the agency level prior to submitting the decision to the Court. Consequently, these comments represent the first opportunity for SeAH to address the position Commerce has taken in its Fourth Redetermination, and the requirement of exhaustion of administrative remedies is inapplicable.  *See e.g.*, *Essar Steel, Ltd. v. United*
*(footnote continued on following page)*

INTRODUCTION

The issue before the Court concerns the use of a statistical concept known as Cohen's $d$ in the Differential Pricing Analysis ("DPA") that Commerce uses to determine whether "there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions, or periods of time" within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B).  Commerce has asserted that it can consider any sale for which it calculates a $d$ of more than 0.8 to be evidence of such a pattern, because "widely-adopted" statistical practice considers a $d$ of 0.8 or more to constitute a "large" effect.[2]  As the Court may recall, we have objected to such a use of Cohen's $d$ by Commerce when, as in this case, the data being analyzed does not satisfy the assumptions laid out by Professor Cohen for the use of his $d$ statistic.

In *Stupp*, the CAFC held that, when an agency purports to apply a mathematical tool, it must apply that tool in a manner consistent with the tool's assumptions.  As the CAFC explained,

> ... Professor Cohen derived his interpretive cutoffs under certain assumptions. Violating those assumptions can subvert the usefulness of the interpretive cutoffs, transforming what might be a conservative cutoff into a meaningless comparator. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) ("The Nash theorem arrives at a result that follows from a certain set of premises. It itself asserts

_____

*(footnote continued from previous page)*
*States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (explaining that the doctrine of administrative exhaustion does not apply where the party had no opportunity to raise the issue before the agency).

[2] *See* Issues and Decision Memorandum for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea (Apr. 18, 2018) at 72-73 (PR-368).  *See also* Commerce's June 27, 2023, Fourth Redetermination (ECF No. 140-1).

> nothing about what situations in the real world fit those premises. Anyone seeking to invoke the theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises. Weinstein did not do so. This was an essential failing in invoking the Solution.").[3]

The CAFC concluded that "the evidence and arguments before us call into question whether Commerce's application of the Cohen's $d$ test to the data in {that} case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test."[4]  The CAFC therefore remanded to give Commerce an opportunity to explain "whether the limits on the use of the Cohen's $d$ test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's $d$ test in less-than-fair-value adjudications."[5]  Accordingly, this Court remanded this case for Commerce to explain its use of the DPA in light of the *Stupp* decision.[6]

In its October 31, 2022, Redetermination (hereinafter "Third Redetermination"), Commerce claimed that "such statistical criteria are not pertinent outside of the context of sampling."[7]  Commerce explained that "{w}hen the entire population of the relevant prices is considered… the actual parameters (mean, standard deviation, and effect size) are

---

[3] *See Stupp Corp. v. United States*, 5 F.4th 1341, 1360 (Fed. Cir. 2021).

[4] *Id.*

[5] *Id.*

[6] *See* Court's June 3, 2022, Order (ECF No. 114).  *See also*, *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1231 (Fed. Cir. 2022) (remanding "for reconsideration in view of *Stupp*").

[7] *See* Commerce's October 21, 2022, Third Redetermination at 21 (ECF No. 119).

mathematically accurate and constant and are not dependent on any statistical criteria."[8] Commerce, therefore, concluded that statistical criteria such as Normality, a sufficient number of observations, and substantially equal variances, "are not relevant to Commerce's application of the Cohen's $d$ test to SeAH's U.S. price data."[9]  However, as explained in our December 2, 2022, brief to the Court, Commerce's Third Redetermination completely failed to address the actual issue raised by the CAFC in *Stupp* and was inconsistent with the academic literature, including materials that were on the record of this case.  In light of this, the Court remanded the matter once more to Commerce to consider the academic material on the record of the proceeding.[10]

On June 27, 2023, Commerce submitted its Redetermination (hereinafter "Fourth Redetermination") to the Court.  In its Fourth Redetermination, Commerce continues to claim that the assumptions of Normality, sufficient number of observations, and substantially equal variances do not need to be met when Cohen's $d$ is calculated using full population data rather than a sample.[11]  In addition, with respect to the 0.8 threshold that Commerce used to determine whether the calculated $d$-statistic is "large", Commerce states that, "{h}aving reviewed the Academic Literature, we find no basis to conclude that the statistical criteria, which raised concerns before the CAFC in *Stupp*, were part of Professor Cohen's selection of these proposed conventions."[12]  Commerce's conclusions, however,

---

[8] *Id*. 59-60.

[9] *Id.* 58-59.

[10] *See* Court's April 14, 2023, Opinion and Order (ECF No. 130).

[11] *See e.g.,* Fourth Redetermination at 10.

[12] *See id*. at 7.

have no support in the academic materials, and are in fact contradicted by Professor Cohen himself.

<u>ARGUMENT</u>

A.   *The Interpretation of a Calculated Value of Cohen's d*
     *Requires that the Statistical Assumptions of Normality,*
     *Equal Variances, and Sufficient Data Be Satisfied Whether*
     *the Data Consists of a Sample or an Entire Population*

In its Fourth Redetermination, Commerce argues that the statistical assumptions of Normality, sufficient observations, and substantially equal variances of the data being compared are only necessary for determining whether a sample is representative of the population such that the *d*-statistic calculated from the sample has statistical significance. Commerce asserts that, because it calculated Cohen's *d* based on "the entire populations of sales observations" in the test and comparison groups of SeAH's U.S. sales, the assumptions necessary to "determine the statistical significance of the calculated results is not relevant for the Cohen's *d* test or the differential pricing analysis as a whole."[13] Commerce's argument is both irrelevant and inaccurate.

As Professor Cohen has explained, a calculated *d*-statistic simply identifies how many standard deviations apart the mean of one set of data is to the mean of the other set of data being compared.[14] The calculated value of the *d-statistic* says nothing about whether an observed difference is "small," "medium," or "large" for the data being evaluated.[15] In

---

[13] *See id*. at 22.

[14] *See* SeAH's June 12, 2023, Submission, Attachment 2, COHEN, STATISTICAL POWER ANALYSIS FOR THE BEHAVIORAL SCIENCES 19-20 (2d ed. 1988) (hereinafter "Cohen") (P4RR-10).

[15] *See id*. at 20-21 (P4RR-10).

order to make that determination, some sort of threshold is necessary to measure the calculated $d$-statistic.[16]

In his textbook, Professor Cohen stated explicitly that his proposed thresholds for evaluating the $d$-statistic were intended to be used solely in conjunction with a "t-test" of statistical significance.[17]  And, as Commerce itself has admitted in other cases, a t-test requires that the assumptions of Normality, equal variances, and sufficient data be satisfied.[18]

Furthermore, there are important mathematical differences between data that satisfy the assumptions of Normality, equal variances, and sufficient data and those that do not — whether that data consists of a sample or an entire population.  Among other things, Normal distributions are defined solely by their mean and standard deviation — which means that any two Normal distributions can be compared by measures that (like Cohen's $d$) consider only their means and standard deviations.[19]  But, as a matter of basic mathematics, non-Normal distributions that are not defined solely by their mean and

---

[16] *See id*. at 24-25 (P4RR-10).

[17] The text in which Professor Cohen introduced his $d$-statistic actually includes numerous alternate measures of effect size, each of which is designed for use with a specific type of tests of statistical significance.  *See* Cohen at 13 ("Each of the Chapters 2-13 will present in some detail the ES index appropriate to the test to which the chapter is devoted.") (P4RR-10).  Professor Cohen identified seven different measures of effect size — labeled *r, q, g, h w, f, and f²* — for use in other situations.  *See, e.g.,* SeAH's May 31, 2023, Submission, Attachment 3, COHEN, STATISTICAL POWER ANALYSIS FOR THE BEHAVIORAL SCIENCES (2d ed. 1988) at vii to ix (P4RR-3, C4RR-4).

[18] *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1325 (CIT 2023).

[19] *See* SeAH's May 31, 2023, Submission, Attachment 1, Coe, *It's The Effect Size, Stupid: What "Effect Size" Is and Why It Is Important* (Sept. 2002) (hereinafter "Coe") at 12 (P4RR-3, C4RR-4).

standard deviation cannot be compared by measures that only consider their means and standard deviations, because such comparisons cannot, as a matter of logic, capture the full nature of the differences between the two data sets.[20]

Tellingly, Commerce's Redetermination makes no effort to address this fundamental mathematical issue.  Instead, it argues that Professor Cohen's proposed thresholds have universal validity simply because they are based on "real-world" observations and are "widely accepted."[21]  But, contrary to Commerce's assertions, the fact that "Dr. Cohen's thresholds are widely accepted" does not imply that they "do not depend on the subjective composition if a particular population (including number of observations, variance, and distribution."[22]  Commerce has not identified any academic materials that state that Professor Cohen's thresholds are "widely accepted" when the data does not satisfy the assumptions of Normality, equal variance, and sufficient data on which Professor Cohen relied.[23]  As a matter of basic mathematics, we would be astonished if anyone were to make such a claim.

_____

[20] *See id*. at 12-13 (P4RR-3, C4RR-4).

[21] *See* Fourth Redetermination at 11.

[22] *Id.*

[23] *Compare* Fourth Redetermination at 7, note 28 (citing Lane for support that Cohen's proposed *d*-statistic thresholds are widely accepted), *with* SeAH's May 31, 2023, Submission, Attachment 4, Lane, David, et al., *Introduction to Statistics, Online Edition* (warning that the "guidelines are somewhat arbitrary and *have not been universally accepted*" and explaining that there are issues with using those guidelines to interpret Cohen's *d* because "the variability in the subjects has a large influence on the effect size measure") (P4RR-3, C4RR-7).

B.   *The Thresholds Established by Professor Cohen Were*
      *Based on an Analysis of Populations that*
      *Meet Specific Statistical Criteria*

Commerce's Fourth Redetermination asserts that it "find{s} no support in the Academic Literature for the claim that Professor Cohen's 0.8 threshold was derived based on the statistical criteria" of Normality, sufficient observations, and substantially equal variance.[24]   Instead, Commerce's Redetermination claims that the "actual numerical values for Professor Cohen's proposed thresholds (*i.e.*, 0.2, 0.5, and 0.8 for small, medium, and large effects, respectively) were not based on research results or statistical analyses, but were threshold numbers that Dr. Cohen proposed because he considered that they will be found reasonable by others."[25]   However, none of the academic sources cited by Commerce in support of that position can reasonably be seen to support Commerce's conclusion that Cohen's proposed thresholds for evaluating the *d*-statistic can be used when the data does not satisfy the assumptions of Normality, equal variances, and sufficient data points.   Indeed, the passages on which Commerce relies for the proposition that Cohen's *d* is widely used but say nothing about *how* Professor Cohen derived the thresholds or what conditions are necessary for such widespread use.[26]

---

[24] Fourth Redetermination at 6.

[25] *Id*. at 6-7.

[26] *See* Fourth Redetermination at 7, note 28 (citing Lane) and at 18, notes 53-54 (citing Ellis).

   1.   *The Thresholds Established by Professor*
        *Cohen Were Based on an Analysis that*
        *Assumed the Data Satisfied the Assumptions of*
        *Normality, Equal Variances, and Sufficient Data*

In his text, Professor Cohen began by providing qualitative definitions of what a

"small," "medium," and "large" effect would look like — defining a small effect as

something that is more than zero but that is not visible to the naked eye; a medium effect

as something that is visible to the naked eye, and a large effect as something that would be

"grossly perceptible."[27]

Professor Cohen went on to explain that one of three measures could be used to

identify whether a $d$-statistic value corresponds to each of the qualitative definitions:

(1) the percent of non-overlap between the two populations being compared, (2) the

correlation between the two populations, and (3) the proportion of the total variance of a

particular outcome within the populations.[28]  Significantly, Professor Cohen explicitly

states that the populations compared for purposes of this analysis are normally distributed

and with equal variability and number of observations.[29]

Professor Cohen then relied on the results of each of these statistical measures to

identify numerical thresholds for large, medium, and small effects in such populations.

For example, Professor Cohen suggested that it would be reasonable to use a $d$-statistic

equal to 0.2 to measure a "small" effect because in "normally distributed populations of

---

[27] *See* Cohen at 13 and 25-27 (P4RR-10).

[28] *See id.* at 21-24 (P4RR-10).

[29] *See e.g.,* at 21 ("If we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous, it is possible to define measures of nonoverlap (U) associated with $d$ which are intuitively compelling and meaningful.") (P4RR-10).

equal size and variability," only 14.7 percent of the two populations will not overlap, and only about 1 percent of the variance of a particular outcome can be attributed to membership of the population.[30]

As a final step, Professor Cohen considered whether the identified thresholds reflected a small, medium, or large effect in the context of real-world examples.  For example, Professor Cohen stated that while the statistical measures would indicate, by themselves, that a $d$-statistic of 0.2 (for populations following the above-mentioned criteria) reflects a small effect, it is further supported by the fact that a 0.2 $d$-statistic has been found to reflect the difference in real-world examples that one would consider the difference to be small, such as the difference in the mean IQ between twins and non-twins and the height different between 15- and 16-year-old girls.[31]

Nothing in Professor Cohen's text could reasonably support the assertion that he simply selected the effect size thresholds based on real-world examples devoid of a statistical analysis that supported the efficacy of using those thresholds to measure the magnitude of a calculated $d$-statistic.  Commerce's attempt to cherry-pick Professor Cohen's discussion of real-world examples out of the context in which he used those examples to derive his thresholds is academically dishonest and cannot be sustained.

---

[30] *Id*. at 25 (P4RR-10).

[31] *See id*. at 25-26 (P4RR-10).

2.   *The Real-World Examples Cited by*
     *Professor Cohen Came from Statistical*
     *Studies of Normally-Distributed Data*

Importantly, the real-world phenomena relied upon by Professor Cohen were not

drawn from distributions whose characteristics were unknown.  In fact, both heights and

IQs are Normally distributed.[32]  And in arguing that differences in heights and IQs

supported his proposed thresholds, Professor Cohen relied on statistical studies of those

phenomena, and not on analyses of entire populations.[33]

The issue in this case, then, is not whether Professor Cohen's proposed thresholds

were supported by real-world phenomena.  Instead, the issue is whether the phenomena on

which Professor Cohen purported to rely provide an appropriate yardstick for measuring

other, unrelated phenomena.  It is quite clear that SeAH does not set its prices based on the

heights or IQs of its customers.[34]  Consequently, before Commerce can use thresholds

derived from heights and IQs to judge SeAH's prices, it must provide some other

justification for considering those thresholds to be relevant.  Commerce must point to some

---

[32] *See e.g.*, SeAH's June 12, 2023, Submission, Attachment 1, Ellis, Paul, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010) at 22 (P4RR-10).

[33] *See e.g.*, Cohen at 26 (citing "Husen, 1959" for the difference in the IQs of twins and non-twins) (P4RR-10).  *See also* SeAH's May 31, 2023, Submission, Attachment 3 at 556 (indicating the full citation as "Husen, T. *Psychological twin research*. Uppsala: Almquist & Wiksell, 1959") (P4RR-3, C4RR-7).

[34] *See*, *e.g.*, SeAH's January 14, 2015, Section A Response at 22 ("The terms of sale and prices for sales of OCTG to customers in the United States vary as a result of sale-by-sale negotiations. SeAH Steel and PPA do not have price lists setting different selling prices or terms of sale depending on the particular customer category or level of trade.") (PR-55, CR-23).

reason for expecting SeAH's prices to have the same inherent characteristics as the data on heights and IQs considered by Professor Cohen.

As a matter of mathematics, there might be a basis for extending Professor Cohen's proposed thresholds to any data that, like heights and IQs, satisfies the assumptions of Normality, equal variances, and sufficient data.  As a matter of mathematics, all Normal distributions are the same if we measure in units of standard deviations from the mean as the center.[35]  Consequently, thresholds based on Normally-distributed data like heights and IQs may provide an appropriate yardstick for assessing other Normally-distributed data.

But that logic only applies to Normally-distributed data.  It does not apply to non-Normal data.  In this case, SeAH's pricing data did not follow a Normal distribution,[36] and it did not have equal variances or a sufficient number of data points in the groups being compared.[37]  Consequently, there is no reason to expect SeAH's prices to have the same

---

[35] *See e.g.*, Coe at 12 (P4RR-3, C4RR-4).

[36] *See* SeAH's Case Brief, 33 at note 77 (PR-319, CR-274).

[37] For example, Commerce's printout of the final margin calculation on remand shows that its Cohen's *d* test included comparisons of, *inter alia*:

(1) a test group consisting of [   ] transactions and a standard deviation of [        ] to a base group consisting of [    ] transactions with a standard deviation of [          ];

(2) a test group consisting of [   ] transactions and a standard deviation of [        ] to a base group consisting of [    ] transactions with a standard deviation of [          ]; and

(3) a test group consisting of [   ] transactions and a standard deviation of [        ] to a base group consisting of [    ] transactions with a standard deviation of [          ].

For all of those comparisons, the Department found the sales to "pass" the Cohen's *d* test. *See* Memorandum concerning the "Draft Second Redetermination Calculations Memorandum" for SeAH (July 13, 2020), Attachment 2, at pages 137-38 and 157-60 (P2RR-2, C2RR-7).

characteristics as the data that Professor Cohen examined when selecting his proposed

thresholds.

C.   *Commerce's Use of Cohen's Threshold is Not "Reasonable"*
     *or Consistent With its "Widely Accepted" Use by Academics*

Commerce's Fourth Redetermination asserts that Professor Cohen himself suggested

that his proposed thresholds could be applied universally, because he stated that "the

proposed conventions {of small, medium, and large effects} will be found to be reasonable

by reasonable people."[38]  In addition, Commerce also relies on statements by other

academics indicating that Professor Cohen's thresholds are "widely accepted."[39]  However,

those statements have been taken out of context and do not acknowledge Professor

Cohen's explanation of when use of his proposed thresholds would actually be reasonable.

1.   *Cohen Explained the Limitations of the*
     *Reasonable Use of the Proposed Thresholds*

First, Professor Cohen warned that *all* conventions, including those that otherwise

may be reasonable, "may be misused and their conventional status thus abused."[40]  In

particular, Professor Cohen highlighted the danger of using a convention simply because of

its status as a convention without consideration of whether it is appropriate for the

particular data being studied.[41]

Professor Cohen also made clear that his proposed thresholds rules-of-thumb were not

intended as a universal yardstick for evaluating effect sizes.  His text emphasized that an

---

[38] Fourth Redetermination at 6.

[39] *See id*. at 7, note 28.

[40] Cohen at 12 (P4RR-10).

[41] *See id*.

attempt to derive a single measure of effect size would be "self-defeating."[42]  And, he specifically cautioned against the use of his rules-of-thumb as a uniform tool for assessing whether a given value of *d* was "small," "medium," or "large" measure even for research within different fields of behavioral science.  To the contrary, he warned that such an assessment had to be "relative … the area of behavioral science or even more particularly to the specific content and research method being employed in any given investigation."[43]  According to Professor Cohen, his proposed thresholds were intended "for use only when no better basis for estimating the {effect-size} index is available."[44]

In short, despite the fact that his proposed thresholds were purportedly based on real-world phenomena, Professor Cohen himself denied that they were universally applicable even within the narrow realm of behavioral-science experiments.  Commerce's suggestion that those thresholds nevertheless be used to assess calculated effect sizes for price differences is, therefore, inconsistent with Professor Cohen's own understanding of the acceptable use of his thresholds.

---

[42] As Professor Cohen explained,

> From one point of view, a universal ES index, applicable to all the various research issues and statistical models used in their appraisal, would be the ideal. Apart from some formidable mathematical-statistical problems in the way, even if such an ideal could be achieved, the result would express ES in terms so unfamiliar to the researcher in behavioral science as to be self-defeating.

*See* Cohen at 11 (P4RR-10).

[43] *Id.* at 25 (P4RR-10).

[44] *Id.*

2. *Professor Cohen's Thresholds Are Not*
*"Widely" Used when His Statistical*
*Assumptions Are Not Satisfied*

There is no doubt that, as Commerce's Fourth Redetermination puts it, Professor

Cohen's proposed thresholds have been "widely accepted" in statistical analysis.[45]

However, as Commerce acknowledges, most statistical analyses are based on samples.[46]

And, such studies typically conform with the assumptions of Normality, equal variances,

and sufficient observations, to permit the reasonable use of Professor Cohen's proposed

thresholds for the *d*-statistic.[47]

Furthermore, it is also widely-recognized by statisticians that Cohen's *d* may

appropriately be used only in limited circumstances — specifically, when comparing

random samples drawn from Normal (*i.e.*, bell-curve shaped) distributions with roughly

equal variance containing a sufficient number of data points.[48]  As one article explains,

> The interpretations of effect-sizes … depend on the assumption that
> both control and experimental groups have a 'Normal' distribution, *i.e.*
> the familiar 'bell-shaped' curve, shown, for example, in Figure 1.
> Needless to say, if this assumption is not true then the interpretation
> may be altered, and in particular, *it may be difficult to make a fair*
> *comparison between an effect-size based on Normal distributions and*
> *one based on non-Normal distributions*.[49]

As a result, the "widely adopted" use of Professor Cohen's *d*-statistic and thresholds does

not mean that they should be adopted in *all* circumstances.  Tellingly, Commerce has not

---

[45] *See* Fourth Redetermination at 11.

[46] *See id*. at 7-9.

[47] *See id*.

[48] *See* Cohen at 19-20 (P4RR-10).

[49] *See* Coe (P4RR-3, C4RR-4).

identified any academic literature suggesting that Professor Cohen's proposed thresholds can be used when the data does not satisfy the assumptions of Normality, equal variances, and sufficient data.

The fact that Professor Cohen's thresholds are widely-accepted for use in some contexts obviously does not imply that they are widely-accepted for use in all contexts.[50] A claw hammer may be used to drive-in nails and even to pull them out.  But it is not the proper implement for inserting or removing screws.  When the data does not satisfy the assumptions laid out by Professor Cohen, his *d* and his proposed thresholds for evaluating that statistic are simply not the right tools.

In these circumstances, Commerce has failed to provide an explanation that demonstrates that its use of Cohen's *d* to determine whether there is a pattern of SeAH's U.S. prices that differ significantly among purchasers, regions, or periods of time is reasonable.[51]

## CONCLUSION

For the foregoing reasons, Commerce's Fourth Redetermination cannot be sustained, and this Court should remand this matter to Commerce once again to address the issues

---

[50] *See* note 23 above.

[51] *See Stupp*, 5 F.4th at 1353 (explaining that the standard for reviewing Commerce's differential pricing analysis and the components of that methodology is reasonableness and citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)).  *See also Mid Continent Steel & Wire*, 940 F.3d at 667 (explaining that the Court must examine whether Commerce provided an adequate explanation to enable the Court to determine "whether the choices are in fact reasonable, including as to calculation methodologies").

raised in this brief regarding the limitations on the reasonable use of Cohen's *d* and

Cohen's proposed cut-offs to data that do not meet the required statistical criteria.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Jooyoun Jeong
WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20006
(202) 774-5500

Attorneys for SeAH Steel Corporation

August 9, 2023

Certificate of Compliance


Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 4,135 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


/s/ Jeffrey M. Winton


August 9, 2023